UNITED STATES of America,
Plaintiff–Appellee,

Charles M. Carberry, Independent Review Board Chief Investigator, Appellee,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO; The Commission of La Cosa Nostra; Anthony Salerno, also known as Fat Tony; Matthew Ianniello, also known as Matty the Horse; Anthony Provenzano, also know as Tony Pro; Nunzio Provenzano, also known as Nunzi Pro; Anthony Corallo, also known as Tony Ducks; Salvatore Santoro, also known as Tom Mix; Christopher Furnari, Sr., also known as Christie Tick; Frank Manzo; Carmine Persico, also known as Junior, also known as The Snake; Gennaro Langella, also known as Gerry Lang; Philip Rastelli, also known as Rusty; Nicholas Marangello, also known as Nicky Glasses; Joseph Massino, also known as Joey Messina; Anthony Ficarotta, also known as Figgy; Eugene Boffa, Sr.; Francis Sheeran; Milton Rockman, also known as Maishe; John Tronolone, also known as Peanuts; Joseph John Aiuppa, also known as Joey O'Brien, also known as Joe Doves, also known as Joey Aiuppa; John Phillip Cerone, also known as

Jackie the Lackie, also known as Jackie Cerone; Joseph Lombardo, also known as Joey the Clown; Angelo Lapietra, also known as The Nutcracker; Frank Balistrieri, also known as Mr. B; Carl Angelo DeLuna, also known as Toughy; Carl Civella, also known as Corky; Anthony Thomas Civella, also known as Tony Ripe; General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Jackie Presser, General President; Weldon Mathis, General Secretary–Treasurer; Joseph Trerotola, also known as Joe T, First Vice President; Robert Holmes, Sr., Second Vice President; William J. McCarthy, Third Vice President; Joseph W. Morgan, Fourth Vice President; Edward M. Lawson, Fifth Vice President; Arnold Weinmeister, Sixth Vice President; John H. Cleveland, Seventh Vice President; Maurice R. Schurr, Eighth Vice President; Donald Peters, Ninth Vice President; Walter J. Shea, Tenth Vice President; Harold Friedman, Eleventh Vice President; Jack D. Cox, Twelfth Vice President; Don L. West, Thirteenth Vice President; Michael J. Riley, Fourteenth Vice President; Theodore Cozza, Fifteenth Vice President; Daniel Ligurotis, Sixteenth Vice President; Salvatore Provenzano, also known as Sammy Pro, Former Vice President, Defendants,

Robert T. Simpson, Jr., Appellant.

No. 898, Docket No. 96–6196.

United States Court of Appeals,
Second Circuit.

Argued Feb. 5, 1997.

Decided June 11, 1997.

---

Peter C. McCabe III, Winston & Strawn, Chicago, IL (Anthony Disarro, Dan K. Webb, Samuel Mendenhall, Winston & Strawn, on the brief), for Appellant.

Karen B. Konigsberg, Assistant United States Attorney, Southern District of New York, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Steven M. Haber, Assistant United States Attorney, on the brief) for The United States of America, Plaintiff–Appellee.

Charles M. Carberry, Investigations Officer, New York City (Evan J. Mandery, Jones, Day, Reavis & Pogue, Celia A. Zahner, Special–Counsel, Investigations Officer, on the brief), for Charles M. Carberry, Independent Review Board Chief Investigator, Appellee.

Before: OAKES, WINTER and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Robert T. Simpson, Jr., appeals from the judgment of the United States District Court for the Southern District of New York (David N. Edelstein, *Judge* ), *United States v. International Bhd. of Teamsters* ("*Simpson* "), 931 F.Supp. 1074 (S.D.N.Y. 1996). The district court affirmed a decision of the Independent Review Board ("IRB"), an investigative and disciplinary body established under the consent decree entered in *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 (DNE) (S.D.N.Y. Mar. 14, 1989) ("Consent Decree"), a civil action filed by the United States under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 (the "RICO Action").[1] The IRB found, *inter alia,* that Simpson brought "reproach" upon the International Brotherhood of Teamsters ("IBT") and interfered with the legal obligations of IBT Local 743 (the "Local"), in violation of the IBT Constitution. The IRB based its conclusions on its factual findings that, on numerous occasions, Simpson allowed Donald Peters, a former IBT official, to act as a representative and agent of the Local and its funds, in violation of Peters' personal settlement agreement ("Settlement Agreement") with the United States in the RICO Action. As a sanction, the IRB barred Simpson from holding any position or obtaining any consulting or other work with the IBT or any IBT-affiliated entity. On appeal, Simpson argues that: (i) the district court erred in finding that the IRB's opinion and decision was supported by substantial evidence, (ii) the district court erred in rejecting Simpson's motion to recuse two IRB members, and (iii) the sanction imposed by the IRB was excessive. We find these arguments to be without merit.

## I.

On February 19, 1988, Donald Peters announced to Local 743's Executive Board (the "Board") that, effective April 1, 1988, he was retiring as president of Local 743, the largest local chapter of the IBT, comprising over 21,000 members in the Chicago area. At the same Board meeting, the Board passed the following resolution regarding Peters (the "1988 Resolution"):

> Upon his retirement, Donald Peters shall be named and designated as President Emeritus of Local 743 for his life and shall continue in addition to act as advisor and consultant to this Local Union.

> To assist in his efforts in connection with his work as described above, Local 743 shall reimburse him for all related expenses he may incur, and shall make available at no cost, an office for his use on the premises of Local 743 with such furniture, equipment, services, publications and assistance, as is or may be deemed necessary

---

1. We have summarized the history of the RICO Action in several prior opinions of this Court. *See, e.g., United States v. International Bhd. of Teamsters* ("*1991 Election Rules* "), 931 F.2d 177, 180–81 (2d Cir.1991). We assume familiarity with this history.

   The district court entered the order in this case as part of its continuing oversight of the implementation of the Consent Decree between the United States and the IBT that resolved the RICO Action. The Consent Decree instituted sweeping structural reforms of the IBT's electoral and disciplinary processes, including the creation of the IRB. *See, e.g., United States v. IBT* ("*Friedman & Hughes* "), 905 F.2d 610, 613 (2d Cir.1990); *United States v. IBT* ("*IRB Rules* "), 998 F.2d 1101, 1105–06 (2d Cir.1993).

   The IRB consists of three members, one chosen by the Attorney General of the United States, one chosen by the IBT, and a third person chosen by the two other IBT designees. The current IRB members are Grant Crandall, Frederick B. Lacey, and William H. Webster. The IRB has broad disciplinary and investigatory powers. *See United States v. International Bhd. of Teamsters,* 842 F.Supp. 1550, 1551 (S.D.N.Y.1994). The IRB uses its investigatory power, *inter alia,* "to investigate allegations of corruption within the IBT, allegations of influence by La Cosa Nostra or other organized crime groups upon IBT members or activities, and any failure of IBT members or leadership to cooperate fully with the IRB." *Id.* at 1551–52. If the IRB finds what it believes is impermissible conduct, it recommends that the IBT file disciplinary charges against those allegedly engaging in this conduct. *Id.* at 1552. In certain circumstances, the IRB is authorized to hold hearings to determine what action is necessary to correct the problems specified in the disciplinary charges. Decisions of the IRB are subject to review by the district court.

and appropriate with all costs therefore to be paid by Local 743.

Peters recommended to the Board that he should become a Trustee of the Local effective April 1, 1988, thus remaining a member of the Local's Board, and that Simpson, then Vice President of the Local, should replace him as President of the Local. Both recommendations were adopted by the Board.

Shortly thereafter, on June 28, 1988, the United States filed the RICO Action against the IBT, its General Executive Board (the "GEB"), the eighteen members of the GEB (including Peters, then still "Ninth Vice President" of the GEB), the Commission of La Cosa Nostra[2] and various asserted members and associates of La Cosa Nostra, alleging that La Cosa Nostra had dominated the IBT through a pattern of racketeering activity. On March 14, 1989, Peters entered into the Consent Decree and the Settlement Agreement, the latter of which required him to retire permanently from all positions as an officer/trustee, agent, representative or employee of the IBT or of any IBT subordinate body. Peters resigned from his various IBT positions by September 1989, pursuant to the Settlement Agreement.

On June 30, 1994, the IRB issued an investigative report to the IBT proposing disciplinary charges against Simpson, the president of Local 743 and an International Trustee of the IBT. The IRB recommended that the IBT file charges against Simpson for "bringing reproach upon the IBT and interfering with the Local's legal obligations by allowing and condoning Donald Peters to continue to act as a representative of Local 743 and to incur expenses paid by the Local despite a prohibition against Peters acting in this capacity."[3]

On July 5, 1994, the IBT referred the charges against Simpson to the IRB for adjudication, "[i]n accordance with past practice and in consideration of Mr. Simpson's position as International Trustee." On December 20 and 21, 1994, the IRB held a hearing on the charges against Simpson. At the hearing, the counsel to Chief Investigator Charles Carberry of the IRB[4] submitted several volumes of documentary evidence against Simpson and orally summarized the evidence contained in these volumes. In response, Simpson testified in his own defense, presented the testimony of Marvin Gittler, the General Counsel of Local 743, and ten other witnesses, and submitted documentary

2. According to the complaint filed in the RICO Action, the Commission of La Cosa Nostra (the "Commission") is the national ruling council of La Cosa Nostra, an organized criminal group headquartered in New York City. The Commission consists of the "Bosses" and/or "Acting Bosses" of the five New York La Cosa Nostra Families (Bonanno, Colombo, Gambino, Genovese, and Lucchese).

3. The IRB recommended the following specific charges against Simpson:

From October 1989 to the present, while the principal officer of Local 743, you allowed and facilitated Donald Peters' continued representation of Local 743 and his continued involvement in IBT affairs, thereby bringing reproach upon the IBT and interfering with the Local's legal obligations in violation ... of the IBT Constitution *to wit:*

As a result of the court-approved settlement agreement entered into by Donald Peters on March 14, 1989 ..., effective June 1, 1989 Donald Peters was prohibited from "any position as an officer, agent, representative or employee of the IBT or any IBT subordinate body...." Based upon this same court-approved settlement agreement, effective September 30, 1989 Donald Peters was prohibited

from "all positions as a trustee, agent, representative or employee of any IBT-affiliated employee benefit fund...."

Despite these prohibitions on Donald Peters' involvement with Local 743 and any other IBT entity, subsequent to October 1, 1989, you allowed Donald Peters to act as a representative of Local 743 and to be involved in the affairs of Local 743 and other IBT entities. Such conduct included, but was not limited to, the following: providing Peters an office on Local 743 premises; allowing Peters to address a rally in 1990 of Local 743 members and a Local 743 shop stewards meeting in 1991; approving a resolution which authorized Local 743 to pay for Peters' expenses while he traveled representing Local 743; allowing Local 743 to pay for expenses in connection with meetings attended by you, Peters and others where union business was discussed; permitting Local 743 to pay for Peters' hotel expenses at the 1991 IBT Convention in Orlando, Florida; and condoning Peters' presence at the 1993 Central Conference of Teamsters Convention in Las Vegas, Nevada.

4. The Chief Investigator of the IRB is in charge of executing the investigatory functions of the IRB.

evidence. *See generally Simpson,* 931 F.Supp. at 1081–89.

In a unanimous Opinion and Decision dated July 25, 1995, the IRB found that, following his September 1989 resignation, Peters continued to have an office on Local 743 premises, and that "[w]ith the assistance and approval of Simpson ... Peters continued to act as a representative and agent of Local 743." The IRB stated that, as the principal officer of the Local, Simpson was obliged to "ensure that he and the Local did not assist Peters in violating the settlement agreement...." The IRB found, however, that Simpson "engaged in a pattern of conduct that allowed Peters to act as an agent and representative of Local 743 and its affiliated benefit funds." Specifically, the IRB found that Simpson permitted Peters to participate as a Local 743 representative in a meeting between union officials and the Hospital Employees Labor Program, a program to organize hospital employees sponsored by Local 743 and a local of the Service Employees International Union. The IRB also found that Simpson, Peters and others met on three occasions in 1990 to discuss ongoing negotiations with the University of Chicago. In addition, Peters met with Simpson and the Chair of the Teamster Montgomery Ward Council, Gayle Crawford, "to discuss matters involving Montgomery Ward & Co." The IRB found that Peters also continued the work he had performed as a trustee of the Local's Health and Severance Funds, by representing the Local in "specific areas of investment performance, collections, resolution of particular benefits claim[s] and the definition of ... particular eligibility criteria" and by attending several meetings regarding the Funds. The IRB also relied on evidence that Peters had traveled to IBT functions on behalf of the Local following his forced resignation under the Settlement Agreement. For example, the IRB found that Peters was reimbursed for expenses relating to a trip with Simpson to St. Louis in 1990, to assist Simpson in his political campaign to become an International Trustee.[5]

The IRB rejected Simpson's contention that Peters had acted merely "as a passive informational resource to Local officials or lawyers"—that Peters remained involved in union and Fund affairs only because he had information that no one else at the Local had. The IRB responded that, "[e]ven if we were to credit Simpson's reasons for Peters' continuing activity on behalf of Local 743, to have allowed Peters to continue to have exclusive possession of pertinent information would reflect, on Simpson's part, a willingness to permit Peters' continuing active involvement with both the union and its funds." In any event, the IRB pointed to several other individuals with the same knowledge and experience who could have provided the Local with any assistance it needed. The IRB also rejected Simpson's claim that, under the Settlement Agreement, Peters was only barred from the positions of "business agent" or "business representative," two specific union positions. Rather, the IRB concluded that "[t]he court-approved agreement set forth a broader prohibition, requiring Peters to permanently resign from all positions as an 'agent' or 'representative' of the IBT, any IBT subordinate body and any IBT affiliated benefit fund." Furthermore, although Simpson claimed that he had relied on advice from the Local's attorney, Marvin Gittler, that Peters' continued involvement with the Local was permissible, the IRB found that

> Simpson could not properly rely on Gittler for advice. Simpson knew that Gittler was Peters' attorney in the civil RICO case....
> Simpson ... could not have reasonably relied upon Gittler's statements concerning

---

**5.** In addition, the IRB found that

1. Simpson[,] in violation of ... the Local 743 Bylaws, failed to conduct a required investigation of Peters after the filing of the civil RICO case in June 1988. *See United States v. IBT [Sansone],* 981 F.2d 1362, 1368 (2d Cir. 1992) ("Every IBT 'officer is a fiduciary with respect to the Union members,' and has a 'duty to disclose and remedy wrongdoing within the IBT.'" ... )

2. Simpson voted to award Peters a car at the Local's expense in violation of ... the Local's Bylaws which provided that title to the car must remain in the name of the Local.

3. Simpson permitted Peters, who did not act as a business representative while a Trustee, to be paid $100,000, more than the other Trustees....

Peters' ability to stay involved with the Local because Gittler was Peters' attorney. Instead ... Simpson should have obtained advice from independent counsel....

For all these reasons, the IRB concluded that "it has been established by a preponderance of the evidence that Simpson brought reproach upon the IBT and interfered with the Local's legal obligations by allowing Peters to act as a representative and agent of the Local." The IRB determined that Simpson must resign as President of Local 743, and directed that he be permanently barred from holding any position with the IBT or any IBT-affiliated entity in the future. The IRB also barred Simpson from obtaining employment, consulting or other work with the IBT or any IBT-affiliated entity.

On July 25, 1995, in accordance with the procedure set forth under the Consent Decree, the IRB submitted its Opinion and Decision with respect to Simpson to the district court for review. Simpson filed objections to the IRB's application and moved to recuse two members of the IRB. On June 27, 1996, in a thorough opinion, the district court affirmed the IRB's decision in all respects. *Simpson*, 931 F.Supp. at 1074. The court found, *inter alia*, that (i) the record fully supported the IRB's determinations with respect to Simpson, *id.* at 1096; (ii) there was no need for any IRB member to recuse himself, and there was no evidence that the IRB was biased against Simpson, *id.* at 1099–1106; and (iii) the sanction imposed by the IRB was neither arbitrary nor capricious, *id.* at 1112–15.

This appeal followed.

## II.

### A. *Standard of review.*

Although we have not previously stated the precise standard of review applicable to a district court order, such as the one before us, that itself reviews an IRB proceeding under the Consent Decree, *see, e.g., United States v. International Bhd. of Teamsters ("DiGirlamo")*, 19 F.3d 816, 819–20 (2d Cir.), *cert. denied*, 513 U.S. 873, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994); *United States v. International Bhd. of Teamsters ("Cimino")*, 964 F.2d 1308, 1311 (2d Cir.1992), the Consent Decree contains "an extremely deferential standard of review" of decisions of the IRB by the district court. *DiGirlamo*, 19 F.3d at 819–20. "The district court is to review decisions of the [IRB] under the same standard of review applicable to review of final federal agency action under the Administrative Procedure Act ["APA"]." [6] *Id.* (internal quotation marks omitted). Accordingly, we have held that the district court is required to treat decisions of the IRB with "great deference." *Id.* at 820. In any event, we need not determine the precise standard of review by the Court of Appeals at this time because we conclude, as we have on several occasions in the past, that the district court's order should be affirmed under any arguably applicable standard of review. *See id.; Cimino*, 964 F.2d at 1311.

### B. *Substantial evidence supporting IRB opinion.*

■ Simpson argues that the district court erred in finding that the IRB's opinion was supported by substantial evidence, one standard of review derived from the APA. Substantial evidence is "something less than the weight of the evidence," *DiGirlamo*, 19 F.3d at 820, but something "more than a mere scintilla," *Cimino*, 964 F.2d at 1311–12. Substantial evidence includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). Accordingly, "the substantial evidence standard may be met despite the possibility of drawing two

---

**6.** Under the APA, in order for a reviewing court to "set aside agency action, findings, and conclusions," it must find that the agency's findings and conclusions are

  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statu-

tory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence ... or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

inconsistent conclusions from the evidence." *DiGirlamo*, 19 F.3d at 820 (internal quotation marks omitted).

Simpson claims, specifically, that the IRB's decision was not supported by substantial evidence because (i) the IRB and district court erroneously believed that the Settlement Agreement prohibited Simpson's conduct; (ii) Simpson's conduct could not have violated the Settlement Agreement because Judge Edelstein and IRB Member Frederick B. Lacey personally approved expenses for Peters and allowed Peters to attend IBT functions following his retirement; (iii) Chief Investigator Carberry was notified by Simpson in September 1991 of Local 743's arrangements with Peters, yet Carberry failed to object to these arrangements for three years; and (iv) Simpson reasonably relied on the advice of Local 743's counsel, Marvin Gittler, with respect to Local 743's arrangements with Peters. We reject all of these claims for substantially the reasons stated by the district court. *See Simpson*, 931 F.Supp. at 1074.

[2] Simpson presses several arguments with respect to the Settlement Agreement. First, he contends that because the 1988 Resolution providing for an advisory and consulting role for Peters was drafted and filed before the Settlement Agreement was drafted and signed, it was unaffected by the Settlement Agreement. Second, he asserts that the language of the Settlement Agreement does not prohibit the advisory and consulting role for Peters set forth in the 1988 Resolution. These arguments are without merit. There is no doubt that the Settlement Agreement permanently barred Peters from acting as an "officer, agent, representative or employee of the IBT or any IBT subordinate body," and the IRB specifically found that Simpson facilitated a representative and agency role for Peters going well beyond "advising and consulting." As the district court noted, "Simpson completely has missed the thrust of both the disciplinary charges against him and the IRB's stated findings regarding those charges." *Id.* at 1099.

Simpson also argues that IRB Member Lacey and Judge Edelstein themselves allowed Peters to use IBT funds in order to act in a representative capacity. However, the expenses to which Simpson refers were incurred when Peters functioned as chairman at an IBT golf tournament. There is no evidence that Peters on that occasion represented IBT interests or acted as an IBT agent on union business. Moreover, even if Peters had acted in such a fashion, there was no evidence to show that either Lacey or the district court had reason to know this in approving the expenses.

[3] Simpson's argument that he is immune from sanctions because Chief Investigator Carberry knew for three years of certain of Simpson's activities is likewise without merit. The Chief Investigator's knowledge did not include the full range of activities the IRB relied upon in concluding that Simpson violated the IBT Constitution. Furthermore, Simpson has not brought to our attention any authority for the proposition that, if the Chief Investigator fails to bring charges immediately after learning of a violation, he is subsequently barred from bringing charges based on those violations. Similarly, it is completely irrelevant whether, as Simpson contends, he severed ties with Peters nearly a year before the charge in the instant case was brought against him.

## C. Recusal of Lacey and Webster.

[4] Simpson argues also, in a claim that he failed to raise before the IRB, that the district court erred in refusing to disqualify IRB Members Lacey and William H. Webster, who, Simpson claims, were biased against him as a political opponent of IBT General President Ron Carey. We affirm the district court's decision rejecting this claim for substantially the reasons stated therein. *Simpson*, 931 F.Supp. at 1099–1106. In particular, as the district court noted,

> Simpson's claim that the IRB is biased against him is based solely on Simpson's speculation and conclusory allegations. Simpson has sought to conjure a claim that Lacey [and Webster are] biased against him from a series of inferences based on a

single sentence in the Puccio Letter [7] that Simpson claims demonstrates that Lacey is biased in favor of Carey. From this one sentence, Simpson infers that Lacey is partial to Carey, that this alleged partiality makes Lacey biased against Simpson because of an alleged "falling out" between Carey and Simpson, and that this alleged bias against him caused the IRB to take action against Simpson that the IRB otherwise would not have taken.

*Id.* at 1106 (footnote added). Assuming for the argument only that Simpson did not waive his claim of bias by failing to raise it before the IRB, we believe that, in light of the attenuated, if not strained, nature of Simpson's claim that Lacey and Webster are somehow biased against Simpson, the district court properly concluded that there was no need for Lacey and Webster to recuse themselves from consideration of Simpson's case.

### D. *Proportionality of sanctions against Simpson.*

Simpson argues, in essence, that the penalty imposed—permanently barring him from holding office in the IBT—was arbitrary and capricious because the penalty, in his view, is harsher than that imposed in other, similar IBT disciplinary proceedings.

■ The district court properly applied the "arbitrary and capricious" standard in reviewing the penalty imposed against Simpson. *See, e.g., United States. v. International Bhd. of Teamsters ("Wilson"),* 978 F.2d 68, 73 (2d Cir.1992) ("The district judge derives his authority . . . from the [Consent Decree], which incorporates the APA standards of review . . . [namely that] a reviewing court may set aside final agency action only if it is arbitrary and capricious. . . ."). We have also stated that "[t]he reviewing court should not overturn the [IRB]'s choice of sanctions unless it finds the penalty unwarranted in law or without justification in

fact." *Id.* (internal quotation marks omitted).

■ Simpson argues here, as he did before the district court, that the IRB "permanently barred" him from the IBT and that "[i]n all the other cases in which the district court affirmed permanent bans by the IRB or its predecessor the Independent Administrator, the wrongdoing has been far more egregious." In each of the cases cited by Simpson, however, the penalty imposed was more severe than the penalty imposed against Simpson—that is, the IBT member was permanently barred from *membership* in the IBT. Simpson, on the other hand, was not barred from membership in the IBT, but only from holding office or acting as an agent on behalf of the IBT. As the district court stated, "[b]ecause the IRB neither 'banished,' 'barred,' nor 'debarred' Simpson from the IBT, nor specifically stripped him of his Union membership, Simpson retains his membership in the IBT, and consequently, the ability to make a living working as a rank-and-file Teamster." *Simpson,* 931 F.Supp. at 1112–13.

Simpson also relies on *United States v. International Bhd. of Teamsters ("Friedman"),* 838 F.Supp. 800 (S.D.N.Y.1993), *aff'd without opinion,* 33 F.3d 50 (2d Cir.1994). Simpson argues that, although the IBT officers in *Friedman* were guilty of more egregious conduct than Simpson's, they received less severe penalties than he.

As Simpson notes, the *Friedman* case appears to be similar to the instant case—involving, as this case does, officers who permitted an offending Teamster, Harold Friedman, to continue to exercise authority over the affairs of a Local notwithstanding Friedman's suspension from the Local. *Id.* at 802. Those officers, however, were only barred from holding a position with the IBT for a period of eighteen months, *id.* at 817, a significantly less severe sanction than the life-

---

7. The "Puccio Letter" is a letter Lacey wrote to a Thomas P. Puccio, who had threatened to "go public" with information he allegedly had with respect to Ron Carey's ties to the Mafia. In the Puccio Letter, Lacey stated that he had told Puccio "that I thought you . . . ought to have in mind what would happen if you brought Carey down in that there were 'old guard' Teamsters throughout the country that were hoping that Carey would be eliminated as a candidate in 1996 so that the clock could be turned back to what it was when I first came on the scene as Independent Administrator."

time ban on office-holding that Simpson received.

We believe, however, that *Friedman* is distinguishable from the instant case. In that case, Friedman was serving a one-year suspension and a three-year statutory bar from serving as an officer or trustee in the IBT or from acting as a consultant or advisor to any labor organization at the time the officers permitted him to continue to exercise influence and authority over the local union. *See id.* at 804. In the instant case, Donald Peters was barred for life from holding office or acting as an agent or representative in the IBT at the time of Simpson's offenses. We believe that the IRB could readily conclude that Simpson's misconduct, in permitting Peters to continue to act on behalf of Local 743 notwithstanding the severe sanction imposed against Peters, was more culpable than that of the officers in *Friedman.*

Furthermore, as Simpson himself has proudly stated, he was a very high level member of the IBT—serving as the president of the largest local in the IBT and as an International Trustee of the IBT. In contrast, the officers in *Friedman* had not attained comparable levels of authority within their local, much less within the IBT. It was well within the IRB's discretion to conclude that, precisely because Simpson was a trusted, high-level official in the IBT, his conduct, in allowing Peters to continue to play a large role in the affairs of Local 743, was more culpable.

Accordingly, we agree with the district court's determination that the penalty imposed by the IRB against Simpson was not arbitrary and capricious.

### III.

We find all of Simpson's arguments to be without merit. We hold that

(1) The district court properly found that the IRB's decision in this case was supported by substantial evidence.

(2) There was no need for IRB members Lacey and Webster to recuse themselves from consideration of the charges against Simpson.

(3) The penalty imposed against Simpson was not arbitrary and capricious.

Accordingly, the judgment of the district court is affirmed.

OAKES, Senior Circuit Judge, dissenting:

I respectfully dissent.

I have certain misgivings about whether the evidence in the record is sufficiently substantial to support the findings of the IRB. These misgivings are based primarily on the fact that the district court's sweeping holding that "all of the objections that Simpson raises to the IRB Opinion Decision ... are meritless," is not entirely accurate. The Government concedes that one objection is sound, namely, that "the IRB did not rely [on] Peters's speaking at a rally in 1990." At least two other objections also have considerable merit: one, that the IRB did not rely on the Local's providing Peters with an office, and, two, that it likewise did not rely on Simpson's allowing Peters to address Local 743's shop stewards' meeting in 1991. On the other hand, the Government is correct that the IRB did mention in a footnote that Peters continued to have an office on Local 743's premises pursuant to the Local's Resolution (passed prior to the court-approved settlement in the civil RICO suit), which enabled the Local's membership to know of Peters's continuing involvement in the union's affairs, and that "it never occurred to Simpson to take away Peters's office" following Peters's resignation in May 1989. The Government is also correct that the IRB pointed out inconsistencies in Simpson's statements, namely, the contrast between his written statement that Peters had made an uninvited appearance at a 1991 shop stewards' seminar and his oral testimony at the IRB hearing that he called Peters to invite him to that seminar. On balance, therefore, I do not permit these misgivings about the strength of the evidence against Simpson to shape this dissent.

I also consider, but ultimately am not persuaded by, the contention that Judge Edelstein and Independent Administrator Lacey approved and sanctioned Peters's activities by permitting Local 743 to pay one expense account for his appearance as the chair of a golf tournament. It is true that, in response

to an interrogatory from the Chief Investigator, Simpson sent the Chief Investigator a copy of the February 19, 1988, Resolution and a copy of Attorney Gittler's May 24, 1989, letter informing Simpson that his dealings with Peters were proper. Simpson further stated his understanding that there was "no prohibition or restriction on associating or working with Mr. Peters or being assisted by Mr. Peters's experience and knowledge." Yet, I do not see how the Chief Investigator could in any way be estopped by having failed to bring charges for three years or even by not having advised Simpson that his conduct was improper. I do think, however, this goes to the appropriateness of the "sentence," which is the point of this dissent.

I say "sentence" advisedly. The Government calls it a "penalty" and "discipline." The district court referred to Simpson's "sanctions." *United States v. International Bhd. of Teamsters*, 931 F.Supp. 1074, 1112–15 (S.D.N.Y.1996). However one refers to the order of the IRB, it amounts to a "permanent bar" "from holding any position with the IBT or any IBT–affiliated entity in the future," and a permanent injunction on his thereafter obtaining "employment, consulting or other work with the IBT, or any IBT-affiliated entity." While the Government interprets this restriction to mean that he is not barred from membership in any Teamsters union, and therefore can presumably still obtain a truck driver's job or its equivalent, it is a pretty severe penalty, sanction or sentence, whatever it is labeled.

It is particularly harsh when we take into account the overall context of Simpson's service to the union and the circumstances surrounding his wrongful conduct.

Simpson is a 60–year–old man who rose from being a Montgomery Ward warehouse worker to becoming the President of Local 743, the largest local in the IBT. He has never been accused of having ties to any criminal organization or having ever associated in any manner with any member of organized crime. Indeed, he cleared two FBI investigations initiated by an IRB member in connection with Simpson's quest to become an International Trustee at the 1991 IBT convention (which was successful, incidental-

ly: Simpson obtained the highest vote total of any person running for any office in that organization). Until the present charges were brought, he had never been accused of any wrongdoing other than having been arrested on a union picket line. He has been a highly-respected labor leader whose character was attested to at the IRB hearing by a former Attorney General of Illinois and a former Mayor of Chicago. He had been named by the U.S. State Department to oversee the elections bringing Nelson Mandela to the leadership of South Africa. The City Council of Chicago unanimously passed a resolution to the effect that he be given back his job. President Ron Carey of the IBT had named Simpson to various positions and panels holding hearings on trustee issues involving various IBT locals, including Locals 1714, 413, 407 and 507, up until August of 1993 when Simpson, as an International Trustee, signed a letter to Carey questioning Carey's handling of IBT finances. Indeed, as late as January 13, 1993, Carey had made Simpson a trustee of Local 703.

Simpson's wrongful conduct consisted largely of condoning Peters's post-retirement association with Local 743. Peters, it should be pointed out, had been President of the Chicago Local from approximately 1945 until April 1, 1988, when he retired at age 69. Moreover, on February 19, 1988, the board passed a resolution designating Peters as President Emeritus for life, calling for his continued participation as advisor and consultant to the union, reimbursing him for expenses that he might incur in that capacity, and making available to him an office on the premises of Local 743. All this occurred before the civil RICO lawsuit was filed against the IBT and its officials. To be sure, when the civil RICO suit was filed, Peters, as a Vice President of the General Executive Board of the IBT, was personally named as a defendant, and the Local 743 counsel undertook his representation. Peters's settlement with the Government, which was memorialized in a consent decree, required him to retire from all positions as an officer, agent, representative or employee of the IBT or any IBT-affiliate, including Employee Benefit Funds. But, the settlement permitted him

to stay on in his existing capacities for periods up to an additional six and one-half months. Moreover, he was permitted, with Government acquiescence, to be reimbursed by the IBT for his legal fees and expenses. The letter from Peters's counsel, which gave Simpson an opinion that Peters's continued association with the local was in accordance with the consent decree, is not a complete defense for Simpson because the legal advice was not independent; yet, the letter should be viewed at least as mitigation of Simpson's conduct.

*United States v. International Bhd. of Teamsters (Sansone)*, 792 F.Supp. 1346 (S.D.N.Y.1992), which imposed a permanent bar to office or a position of trust, is perhaps the closest case to the present one. Our opinion affirming that decision held that, while defendant Sansone's penalty was "admittedly drastic," and while it was true that there had been no suggestion that Sansone himself had ties to organized crime, his refusal to recognize his duty to investigate union officials who were connected to organized crime demonstrated that he was unfit to occupy a position of trust. *United States v. International Bhd. of Teamsters (Sansone)*, 981 F.2d 1362, 1372 (2d Cir.1992). While stating that we might not have reached the same conclusion as did the Independent Administrator, we upheld the latter's ruling "[i]n an effort to maintain the institutional integrity of the Union and to dissipate a climate where Union officials acquiesce in the criminal exploits of their colleagues...." *Id.*

Unlike *Sansone*, however, there is not a shred of evidence here that Simpson had even a hint of Peters's connection with organized crime other than the fact that he had been named as a defendant in the civil RICO suit in his capacity as one of the 16 Vice Presidents on the IBT General Executive Board. This fact is far from conclusive—people get named as defendants in civil RICO suits every day without being connected to La Cosa Nostra. It was not until January of 1993 that Attorney Gittler was advised that an FBI agent stated in an affidavit that he believed Peters had ties to organized crime in that he was "an associate of LCN Capo Joseph Lombardo." Gittler so advised Simpson sometime in January 1993. But the same affidavit went on to list the names of all Chicago area union members associated with organized crime, and Peters's name was not on the list. A few months later, in August 1993, a second affidavit containing identical allegations against Peters as the first one prompted Simpson to order that Local 743's relationship with Peters be severed. This was one year before the present charges were brought.

Contrary to the Government's assertion, I do not think that this case is in any respect as egregious as *Sansone*. Though I was a member of the panel that voted to affirm in *Sansone*, I believe that the sanctions against Simpson are too severe and would accordingly remand for imposition of a lesser punishment, such as a temporary barring of Simpson from positions of trust, rather than the permanent one that has been ordered.