UNITED STATES of America, Plaintiffs,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Defendants.

No. 88 Civ. 4486(DNE).

United States District Court, S.D. New York.

Dec. 30, 1997.

## OPINION & ORDER

EDELSTEIN, District Judge.

### BACKGROUND

This opinion emanates from the voluntary settlement of an action commenced by the United States of America against, *inter alia,* the International Brotherhood of Teamsters ("IBT" or "the union") and the IBT's General Executive Board. The settlement is embodied in the voluntary consent order entered March 14, 1989 ("Consent Decree"). The goals of the Consent Decree are to rid the IBT of the hideous influence of organized crime and establish a culture of democracy within the union. The long history of this case has been set forth in this Court's numerous prior opinions. Accordingly, only those facts necessary for resolving the instant appeal shall be set forth.

The 1996 IBT Election took place in the final months of 1996 and the ballot count concluded on February 27, 1997. *See* Declaration of Barbara Zack Quindel, dated August 21, 1997 ("Quindel decl.") at ¶ 4. Following Election Officer Quindel's announcements of the winning candidates, post-election protests were filed. Quindel decl. ¶ 4. Election officer Quindel conducted an investigation of the post-election protests and uncovered serious violations of the 1996 Election Rules. On August 21, 1997 she issued her decision concerning certain postelection protests. *See In re: Jeraldine Cheatem, et al.,* Post–27–EOH (BZQ) (Aug. 21, 1997) (Rerun Decision) ("*Cheatem,* (Rerun Decision)").

In her decision, Election Officer Quindel found that in September 1996, Ron Carey

("Carey") campaign operatives met and concluded that the race was close and that the James Hoffa ("Hoffa") Campaign was raising between four and five times what the Carey Campaign was raising. *Cheatem,* (Rerun Decision) at 68. The Carey Campaign operatives determined that Carey would lose without additional money, and that the race was winnable but not unless the right people voted. *Id.*

Thus, in October 1996, Carey Campaign operatives implemented a scheme whereby IBT general treasury funds would be disbursed to certain political organizations upon the understanding that those organizations would make payments to the Carey campaign. *Id.* at 69–71. Carey personally authorized certain of these disbursements from IBT general treasury funds. *Id.* at 72–75. The Election Officer further found that in October and November 1996, other improper or illegal contributions in substantial amounts were made to the Carey Campaign. *Id.* at 75–78.

In addition, Election Officer Quindel determined that a "large, direct mail campaign" was a key part of the "final efforts" of the Carey Campaign, and that during the week prior to the end of the voting period, between November 4 and November 9, 1996, the Carey Campaign mailed 1,697,214 pieces of campaign literature. *Id.* at 78–79. The campaign targeted the mailings so that members in certain groups would receive anywhere from one to five pieces of mail over the course of a week, *id.* at 79, and the contributions that supported the mailings, were "the product of employer solicitations and/or employer-created schemes to inject employer and IBT funds into the Carey Campaign, as well as to induce individuals to contribute through the improper manipulation of IBT spending." *Id.* at 96.

Election Officer Quindel concluded that "[t]he Carey Campaign and each member of the Carey slate violated Article XII, Section 1(b) of the Rules by receiving the use and benefit of the prohibited contributions." *Id.* at 98. Based on these findings, she deter-

mined that these impermissible campaign contributions may have affected the outcome of the races of every member of the Carey slate nationwide. Thus, she issued her decision refusing to certify the results of the 1996 Election and ordering a new election for all positions except for those won by the Hoffa slate, and the President of Teamsters Canada, an uncontested race. *Id.* at 114–15.

Election Officer Quindel further determined, based on the evidence available to her at that time, that (1) individuals working on the Carey campaign were responsible for soliciting these improper contributions and (2) Carey himself did not have knowledge of, or involvement in, these violations. Notwithstanding the latter determination, Election Officer Quindel stated that "[i]f, subsequent to the issuance of this decision, evidence is brought to the Election Officer's attention that could warrant disqualification of Mr. Carey ... the Election Officer will consider it." *Id.* at 119.

Additional evidence did come to light after Election Officer Quindel's decision of August 21, 1997. On September 18, 1997, Jere Nash ("Nash"), Martin Davis ("Davis"), and Michael Ansara ("Ansara"), each pled guilty in the United States District Court for the Southern District of New York to felonies arising out of their conduct on behalf of the Carey campaign.[1] As part of their respective plea agreements, Nash, Davis, and Ansara each agreed to cooperate fully with the United States Attorney's Office.

Based on this new information, Election Officer Quindel reopened her investigation into whether Carey had knowledge of, or involvement in, the illegal acts perpetrated by these three individuals. However, during the course of her inquiry, Election Officer Quindel discovered information which led her to recuse herself from any further investigation. *See* Letter from Barbara Zack Quindel, Election Officer for IBT, to Honorable David N. Edelstein (Sept. 23, 1997). Thus, by Order dated September 29, 1997, this Court designated Honorable Kenneth Conboy as Election Officer "for the sole purpose

---

1. Nash pled guilty to one count of conspiracy and one count of making false statements. Davis pled guilty to one count of conspiracy, one count

of embezzling union funds and one count of mail fraud. Ansara pled guilty to one count of conspiracy.

of investigating and deciding the issue of disqualification of Ronald Carey from the rerun election" (the "Election Officer"). *See* September 29, 1997 Order at 2.

After a comprehensive investigation, by decision dated November 17, 1997, the Election Officer found that Carey had knowledge of and engaged in extensive violations of the Rules governing the 1996 election. *See In re: Jeraldine Cheatem, et al.*, Post–27–EOH (KC) (Nov. 17, 1997) (Carey Disqualification Decision) (*"Cheatem*, (Carey Disqualification Decision)"). Based on these findings, the Election Officer disqualified Carey from running as a candidate in the rerun election.

On December 2, 1997, Carey filed with this Court an appeal of the Election Officer's decision disqualifying him from running as a candidate in the rerun election. Additionally, the Hoffa slate filed an appeal requesting an order requiring members of the Carey slate, jointly and severally, to repay the improper campaign contributions identified in the Election Officer's decision, and an order disqualifying the entire Carey slate from the rerun election.

### DISCUSSION

In his appeal to this Court Carey makes three arguments. First, he charges that he was denied due process because he was not afforded a hearing before the Election Officer. Appeal of Ron Carey from the November 17, 1997 Decision of the Election Officer ("Carey Br.") at 19–41. Second, he argues that the Election Officer should have credited his testimony over that of his campaign manager, his personal secretary, and the IBT's Director of Government Affairs. Carey Br. at 11–18. Finally, he asserts that, notwithstanding the Election Officer's findings, disqualification is an inappropriate remedy. *Id.* at 75. Each of these arguments is addressed below.

### I. DUE PROCESS & LMRDA

Carey argues that by not holding a hearing, the procedures followed by the Election Officer failed to satisfy the Due Process

Clause of the United States Constitution, and section 101(a)(5) of the Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.* (the "LMRDA"). *See* Carey Br. at 18–41. In response, the Government and the Election Officer assert that "the Election Officer's disqualification decision implicates neither the Due Process Clause nor the LMRDA," and thus Carey was not entitled to a hearing before the Election Officer. Letter from Karen Konigsberg, Assistant United States Attorney, to Honorable David N. Edelstein (Dec. 18, 1997) ("Konigsberg Letter") at 12; Election Officer's Statement Regarding the Appeal of Ronald Carey from the November 17, 1997 Decision of the Election Officer ("EO Br.") at 11–19.

### A. DUE PROCESS

 Due process protections apply only to government action, and not to that of private parties. *United States v. IBT ("Senese")*, 941 F.2d 1292, 1295 (2d Cir.1991). "[A] litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'" *Id.* In order to qualify as state action, "the conduct in question 'must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible' and 'the party charged with the [conduct] must be a person who may fairly be said to be a state actor.'" *Id.*, at 1296 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982)).

 This Court and the Second Circuit have held that the Election Officer is not a state actor. *United States v. IBT ("Star Market")*, 954 F.2d 801, 806–07 (2d Cir.1992); See *also, United States v. IBT ("1996 Election Rules Order")*, 896 F.Supp. 1349, 1363 (S.D.N.Y.1995), *aff'd as modified*, 86 F.3d 271 (2d Cir.1996); *United States v. IBT*, No. 86 Civ. 4486, 1991 WL 334242, *11 (S.D.N.Y. Nov.19, 1991).[2] Carey's assertion, that a

---

2. The Second Circuit has also repeatedly held that the other officers appointed pursuant to this Consent Decree are not state actors. *See e.g.,*

*United States v. IBT ("Sansone")*, 981 F.2d 1362, 1371 (2d Cir.1992); *United States v. IBT ("Nunes")*, 962 F.2d 4, 1992 WL 97684, slip op.

number of factors require this Court to reach a different result this time, is without merit.

■ In arguing that the Election Officer is a state actor, Carey first stresses that the Election Officer "was compensated by the federal government." Carey Br. at 22. He further argues that the Election Officer is a state actor because the Government is "apparently paying for at least some percentage" of the office space at the Election Officer's private law firm when it pays an hourly fee to the Election Officer. Carey Br. at 22–23 n. 12. This Court has already considered and rejected these arguments. *See 1996 Election Rules Order,* 896 F.Supp. at 1363. The mere receipt of public money does not transform a private actor into a state actor. *See, e.g., San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 544, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 (1987).

Next, Carey contends that the Election Officer should be considered a state actor because the Election Officer "placed great weight" on Carey's alleged "violation of federal statutes, including RICO." Carey Br. at 23. While the Election Officer referred to RICO and the LMRDA by way of analogy, it is abundantly clear that the Election Officer's decision was based upon a violation of the Election Rules, not federal laws. In his decision, the Election Officer stated, "disqualification of candidates is a permissible exercise of the Election Officer's remedial authority under the Consent Decree, as well as the Election Rules." *Cheatem,* (Carey Disqualification Decision) at 52. Indeed the decision to disqualify was based solely on Carey's direct breaches of the 1996 IBT Election Rules and his toleration of violations of the Rules by his campaign officials. The 1996 Election Rules state that:

> [i]f as a result of any protest filed or any investigation undertaken by the Election Officer ..., the Election Officer determines that the Rules have been violated or that any other conduct has occurred which may prevent or has prevented a fair, honest, open and informed election, the Election Officer may take whatever remedial action is appropriate. Such remedial ac-

tion may include, without limitation: (a) placing or removing any nominee from the ballot; (b) adding or removing any candidate from a slate; (c) qualifying or disqualifying any member from seeking any delegate, alternate delegate or International Officer position....

1996 Election Rules, Art. XIV, Sec. 4(c). Therefore, the Election Officer's decision to disqualify Carey from running in the rerun election was well within his authority derived from the Consent Decree and the 1996 Election Rules, and thus Carey's claim that the Election Officer's "decision was premised in part on violations of federal statutes" is without merit. Carey Br. at 26.

Finally, Carey contends that the Election Officer's decision constituted state action because the Election Officer "worked closely with" and received information from "federal law enforcement authorities." Carey Br. at 24. Again, Carey misinterprets the state action inquiry. "[T]he Court officers act as stand-ins for the IBT General President and the GEB, and not as the Government." *United States v. IBT ("Ballew"),* 764 F.Supp. 817, 823 (S.D.N.Y.1991), *vacated and dismissed as moot,* 964 F.2d 180 (2d Cir.1992). The Court-appointed officers derive their authority from the IBT Constitution, a private agreement, and "not from any provision of federal or state law." *Senese,* 941 F.2d at 1296. The state action inquiry turns on whether the Election Officer's *decision* is fairly attributable to the Government, not on the source of the information received by the Election Officer.

The decision to disqualify Carey was a decision made by a private actor acting pursuant to a private agreement. The Government's assistance to the Election Officer did not transform him into a state actor. Accordingly the Election Officer's decision to disqualify Carey is not "state action" and therefore does not implicate the Due Process Clause.

### B. LMRDA

■ Carey also argues that he was entitled to a hearing under section 101(a)(5) of

---

at 2–3 (2d Cir.1992); *Star Market,* 954 F.2d at

806; *Senese,* 941 F.2d at 1296–97.

the LMRDA. *See* Carey Br. at 27. Section 101(a)(5) provides that a union member who is "fined, suspended, expelled or otherwise disciplined" is entitled to the procedural protections set forth in that subsection. 29 U.S.C. § 411(a)(5). Carey contends that disqualification constituted "discipline" within the meaning of section 101(a)(5) of the LMRDA. Carey Br. at 28.

■ The word "discipline" as used in section 105(a)(5) of the LMRDA does not encompass the remedy of disqualification imposed by the Election Officer. The Supreme Court has stressed that Title I of the LMRDA safeguards the rights of union members *as members,* and does not protect or guarantee rights to individuals as officers or employees of the union. *See Finnegan v. Leu,* 456 U.S. 431, 437, 102 S.Ct. 1867, 1871, 72 L.Ed.2d 239 (1982) (stating that "[i]t is readily apparent, both from the language of these provisions and the legislative history of Title I, that it was rank-and-file union members—not officers or employees, as such—whom Congress sought to protect"). The term "discipline" in Title I "refers only to retaliatory actions that affect a union member's rights or status as a member of the union." *Finnegan,* 456 U.S. at 437, 102 S.Ct. at 1871.

The Election Officer's role under the Consent Decree is to supervise the 1991 and 1996 IBT Elections, and to resolve disputes concerning the conduct of those elections. Consent Decree, Sec.. B(3)(1) and Sec. F(12)(D)(ix). The Consent Decree established a distinct entity to impose discipline in the IBT. The Consent Decree provides for an Independent Review Board ("IRB") which is empowered with disciplinary authority. Consent Decree, Sec. G. Consistent with this structure, the same conduct that resulted in Carey's disqualification by the Election Officer has also subjected him to an independent disciplinary action by the IRB.

■ On November 25, 1997, the IRB recommended that charges be filed against Carey alleging that he schemed to divert $885,-000 in union treasury money to his campaign. Because the IRB's function is to discipline Carey, the IRB is required to comply fully with the procedural requirements of section

101(a)(5) of the LMRDA. *See United States v. IBT,* 870 F.Supp. 557, 560–61 (S.D.N.Y. 1994) (stating that section 105(a)(5) requires a union to provide a fair hearing when taking disciplinary action against a member).

Carey attempts to characterize the Election Officer's exercise of authority as disciplinary by pointing out that, in other situations, the disqualification of candidates for union office may constitute disciplinary action. *See, e.g., Schonfeld v. Penza,* 477 F.2d 899, 903 (2d Cir.1973) (union official disqualified from office for advocating and implementing changes in union structure and procedures); *NLRB v. International Ass'n of Bridge, Structural & Ornamental Iron Workers,* 864 F.2d 1225, 1227 (5th Cir.1989) (president of local chapter disqualified from holding office for filing, without authorization, an unfair labor practices charge with the NLRB on behalf of the local chapter); *Goodman v. Laborers' Int'l Union,* 742 F.2d 780, 782 (3d Cir.1984) (union member disqualified from holding office for exceeding his authority while acting as the local's business manager). However, none of the examples cited by Carey involved circumstances where disqualification was effected by an officer appointed under a Consent Decree for the specific purpose of protecting union democracy.

The decision of the Election Officer to disqualify Carey does not trigger Section 105(a)(5) of the LMRDA as the decision was not disciplinary in nature. It was carried out pursuant to his *remedial* authority and for *remedial* purposes. *See Cheatem,* (Carey Disqualification Decision) at 47–55. The Election Officer noted the distinction between his role and that of the IRB, stating that the "primary role of the Election Officer is not to punish misconduct," and that the IRB was the appropriate entity to mete out punishment. *See Cheatem* (Carey Disqualification Decision) at 54. Therefore, Carey's disqualification was not "discipline" under section 101(a)(5) of the LMRDA.

■ Furthermore, although Carey's disqualification affects Carey in his capacity as an officer of the IBT, it does not directly affect his protected rights as a member of

the IBT. Title I of the LMRDA, titled "Bill of Rights of Members of Labor Organizations," safeguards the rights of union members to nominate candidates, vote in elections or referendums, and to attend and participate in the deliberations and voting at membership meetings. 29 U.S.C. § 411(a)(1). The right to hold office is "not among the rights guaranteed by [29 U.S.C. § 411." *Local 115, United Bhd. of Carpenters and Joiners of America v. United Bhd. of Carpenters and Joiners of America,* 247 F.Supp. 660, 662 (D.Conn.1965). Similarly, the privilege of being a candidate for elective union office is not among the membership rights protected by section 101(a)(5) of the LMRDA.

The process to which Carey was entitled is set forth in the 1996 Election Rules. Article XIV, section 3 of the 1996 Election Rules governs the procedures for the filing and adjudication of post-election protests. It provides:

> [t]he Election Officer shall provide a copy of the protest to any person or entity which the Election Officer determines may be a subject of the protest, decision or remedy. Each such person or entity shall have the opportunity to present evidence and/or legal argument to the Election Officer.

1996 Election Rules, Art. XIV, Sec. 3(d). In his appeal, Carey does not claim that he was denied the right to receive a copy of the protest or that he was denied the opportunity to present evidence and/or legal argument to the Election Officer.

■ Carey received all the process due to him under the Election Rules to which he agreed to be bound. Nevertheless, Carey argues that, if the Election Officer's decision is not reversed, he should be afforded an evidentiary hearing by this Court. Carey Br. at 86. In his appeal, Carey often hints that he is prepared to offer "substantial new evidence" that would somehow cast doubt upon the Election Officer's findings. *See, e.g.,* Carey Br. at 12 n. 4; 17 n. 8; 44 n. 26; 53; 57; & 60 n. 29. However, Carey offers no good reason why he failed to present this alleged evidence to the Election Officer. This Court sees no reason to conduct an evidentiary hearing in light of the Election Officer's extensive and comprehensive investigation.

Accordingly, this Court finds that Carey is not entitled to a hearing under section 101(a)(5) of the LMRDA.

## II. THE ELECTION OFFICER'S DECISION

### A. Standard of review

■ In reviewing the decisions of the Election Officer, this Court applies the "arbitrary and capricious" standard of review. Findings of the Election Officer are entitled to great deference under the Consent Decree, and a decision of the Election Officer will not be disturbed unless that decision is, on the basis of all the evidence, "arbitrary and capricious." *See, e.g., United States v. IBT ("Collins"),* 1996 WL 408608 (S.D.N.Y.); *United States v. IBT ("Cook"),* 1996 WL 392147 (S.D.N.Y.). The Election Officer "has broad discretion in fixing an appropriate remedy." *United States v. IBT ("Montante"),* 1996 WL 315825 (S.D.N.Y.1996).

### B. The Election Officer's Findings

■ The decision of the Election Officer is reviewed under the "same standard of review applicable to review of final federal agency action under the Administrative Procedures Act," and will not be overturned unless that decision is, based on all the evidence, "arbitrary and capricious." *Montante,* 1996 WL 315825, *5 (S.D.N.Y.). As the Government states in its papers to this Court, "Carey's arguments on appeal invite this Court to reweigh the evidence and reassess the Election Officer's credibility determinations." Konigsberg Letter at 2. Such an undertaking would contravene the well-established principle that the factual findings of the Election Officer are entitled to great deference. *United States v. International Bhd. Of Teamsters ("Thibault"),* 88 Civ. 4486, 1996 WL 728696 (Dec. 13, 1996 S.D.N.Y..).

The Election Officer engaged in an extensive investigation in which he interviewed numerous witnesses and reviewed thousands of documents. Based upon this thorough investigation, the Election Officer found that

Carey knew of and participated in illicit fundraising schemes, including the expenditure of $735,000 in IBT general treasury funds, and the solicitation and receipt of tens of thousands of dollars from non-IBT union officials and others defined as employers under the Rules for the 1996 IBT election. *Cheatem,* (Carey Disqualification Decision) at 69.

In addition, the Election Officer found that Carey's denials were not trustworthy. In particular, the Election Officer found that Carey's denial of having any knowledge of the improper fundraising schemes and his claim to have no recollection of the four requests for political contributions at issue, including a $475,000 contribution to Citizen Action was not credible. As the Election Officer noted in his decision, "given the unprecedented size of the contribution, and the troubled financial condition in October 1996 of the IBT's general treasury and the IBT's political action committee … I find it completely untenable that Mr. Carey, notwithstanding his admittedly hectic schedule, has no recollection of the Citizen Action contribution." *Cheatem,* (Carey Disqualification Decision) at 29.

This Court and the Second Circuit have observed that the Consent Decree officers are "best equipped to evaluate the demeanor, credibility, and ultimately the culpability of those who appear before [them]." *United States v. International Bhd. Of Teamsters ("DiGirlamo"),* 824 F.Supp. 410, 418 (S.D.N.Y.1993). After an extensive investigation, and careful evaluation of the evidence and testimony the Election Officer found Carey's denials incredible and the testimony of Carey's campaign manager, Jere Nash, Carey's secretary, Monie Simpkins, IBT's Director of Government Affairs, William W. Hamilton, Jr., and others to be credible. The Election Officer thus found that Carey committed a "clear and serious violation of the Election Rules." *Cheatem,* (Carey Disqualification Decision) at 35. There is ample support for the Election Officer's determination, and thus these factual determinations are entitled to great deference and will not be disturbed.

## C. The Remedy of Disqualification

 The Election Officer has broad discretion in fixing an appropriate remedy. *See Montante,* 1996 WL 315825, *5–6; *United States v. International Bhd. of Teamsters ("Friedman"),* 838 F.Supp. 800, 815, *aff'd,* 33 F.3d 50 (2d Cir.1994). The Election Officer's selection of remedies is also reviewed under an "arbitrary and capricious" standard, and is entitled to great deference. *Montante,* 1996 WL 315825 *6. In reviewing the remedy imposed by the Election Officer, this Court may only consider whether the Election Officer "made an allowable judgment in his … choice of remedy." *United States v. International Bhd. of Teamsters ("Wilson, Weber & Dickens"),* 978 F.2d 68, 73 (2d Cir.1992) (quoting *Sokoloff v. Saxbe,* 501 F.2d 571, 576 (2d Cir.1974)). This Court will not overturn the Election Officer's choice of sanctions "unless it finds the penalty 'unwarranted in law' or 'without justification in fact.'" *Id.* (quoting *Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973)).

 In challenging the Election Officer's choice of remedy, Carey advances several arguments. First, Carey suggests that disqualification is appropriate only for violations such as ballot collection, and voter intimidation, or where an individual repeatedly violates the Election Rules. Carey Br. at 76. He argues that disqualification is not appropriate in this case because the rerun election would be sufficient to guarantee a free, fair, open and informed election. He states that disqualification "should only be imposed where the violation irreparably and irremediably undermines the democratic process such that even a new untainted election will not allow the true expression of the will of the rank and file." *Id.*

As noted, the Election Officer's selection of a remedy is entitled to great deference. The Election Rules authorize the Election Officer to take "whatever remedial action is appropriate," if the Election Officer "determines that the [Election Rules] have been violated or that any other conduct has occurred which may prevent or has prevented a fair, honest, open and informed election." *See* Election Rules, Art. XIV, Sec. 4. The

Election Officer concluded that disqualification was indispensable in this case to protect the IBT's democratic processes. *Cheatem,* (Carey Disqualification Decision) at 72–74. He determined that a level playing field in the rerun election with Carey on the ballot could not be achieved because of the huge campaign benefit Carey procured through his misconduct. *Id.* at 73. Further, the Election Officer found that given the egregious nature of the misconduct, failure to disqualify would constitute a damaging precedent that would undermine the deterrent effect of the Election Rules in the future and would open future IBT elections to the risk of repeated injury, both by Carey and his supporters, and other parties. *Id.* at 72. Thus, the Election Officer concluded that disqualification was necessary because no other action would adequately protect the integrity of the Consent Decree and its goals. *Id.* at 73.

Second, Carey argues that the Election Officer "fundamental[ly] misperce[ived]" his role and "overstepped his authority" because he disqualified Carey in order to punish misconduct rather than to ensure a fair rerun election. Carey Br. at 83, 79. This argument is without merit.

In selecting the appropriate remedy, the Election Officer specifically concluded that this remedy was necessary to prevent Carey and others from repeating the misconduct in the rerun, to preserve the deterrent effect of the Election Rules, to level the playing field in the rerun, to protect the integrity of the institution-building goals of the Consent Decree, and maintain confidence and respect for the Consent Decree and its goals among the membership. *Cheatem,* (Carey Disqualification Decision), at 72–73. As discussed, the Election Officer's decision was remedial in nature, did not constitute punishment and was well within the Election Officer's authority under the Consent Decree and the 1996 Election Rules.

Third, Carey asserts that "[c]ase law under the [LMRDA] ... compels the conclusion that disqualification is inappropriate here." Carey Br. at 79 n. 34. He claims that the LMRDA is designed to promote union democracy, and that the LMRDA does not provide for disqualification as a remedy. *Id.* This argument reflects a fundamental misunderstanding of the Consent Decree. As the Government notes in its papers, "the electoral reforms required by and implemented under [the] Consent Decree are premised on the notion that LMRDA standards were not sufficient to rid the IBT of corruption and the influence of organized crime, or to bring democracy to the IBT." This Court and the Second Circuit have often noted that the remedies under the Consent Decree were designed to supplement remedies provided under other laws. *See, e.g., United States v. IBT ("Star Market"),* 954 F.2d 801, 809 (2d. Cir.), *cert. denied,* 505 U.S. 1205, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); *United States v. IBT (Election Rules Order),* 896 F.Supp. 1349, 1366 (S.D.N.Y.1995), *aff'd as modified,* 86 F.3d 271 (2d Cir.1996). The Consent Decree provides the Election Officer with the authority to fashion appropriate relief to ensure a fair, free democratic and informed election. He is not constrained by the remedies available under other laws.

Finally, Carey has the audacity to suggest that disqualification is unwarranted "[w]here, as here, allegations of improper fundraising by both slates are pervasive." Carey Br. at 76. This Court will not entertain such irrational arguments. *Cf. United States v. IBT ("Windsor Graphics"),* 765 F.Supp. 1206, 1211 (S.D.N.Y.1991) (finding that the argument that the prior conduct of union officers was more corrupt than the current improper conduct was "sheer sophistry"). The new Election Officer, Michael Cherkasky, is currently investigating the allegations against the Hoffa slate and will determine appropriate remedies should it become necessary.

The remedy in this case is both "proportionate to the misconduct at issue ... and appropriate for ameliorating the harm that this misconduct caused." *Montante,* 1996 WL 315825, *6. Therefore, the Election Officer's choice of remedy was not arbitrary nor capricious and will not be disturbed.

## III. HOFFA APPEAL

█ On December 1, 1997, the Hoffa slate filed its appeal of the Election Officer's decision to disqualify Carey from the rerun

election. According to the Hoffa slate, "the members of the Carey Slate must be required, jointly and severally, to repay the illegal contributions identified in Election Officer Conboy's decision and must be disqualified from participating in the rerun election." Statement in Support of Appeal of the Hoffa Slate from the Decision of Election Officer Kenneth Conboy in Post–27–EOH et al ("Hoffa Br.") at 7.

The Hoffa slate argues that the Election Rules require this Court to order members of the Carey slate to return the illegal contributions identified in *Cheatem*, (Carey Disqualification Decision). The Hoffa slate relies on the provision of the Election Rules holding candidates strictly liable to "insure that each contribution received is permitted under the Rules," and requiring the return of any prohibited contributions. 1996 Election Rules Art. XII, Section 1(b)(9).

First, this Court charged Election Officer Conboy solely with the duty of investigating and deciding the question of disqualification of Carey. Furthermore, in her decision of August 21, 1997, ordering a rerun election, Election Officer Quindel concluded that, other than the issue of the disqualification of Carey and other slate members, the Election Officer "will not consider any additional evidence or further protest relating to the conduct of the initial election." *Cheatem*, (Rerun Decision) at 129. Rather, Election Officer Quindel stated that the "investigation of the initial election is considered closed," and the outstanding matters are left to other forums, including the IRB and the Government to pursue. *Id.* In fact, "the United States Attorney's Office has already taken steps to force the disgorgement of the bulk of [the contributions about which the Hoffa slate complains]." Letter from Beth E. Goldman, Assistant United States Attorney, to Honorable David N. Edelstein (Dec. 18, 1997) at 2.

There is no basis on which to conclude that the proper remedy in this matter would be an order holding the members of the Carey slate jointly and severally liable for the repayment of the improper contributions. Given Election Officer Conboy's narrowly defined duties, and the fact that the investiga-

tion into the initial election was considered closed, the Election Officer acted well within his discretion not to order repayment of the improper contributions.

 Finally, the Hoffa slate urges this Court to disqualify the entire Carey slate from running in the rerun election. There is absolutely no merit to this request. As Election Officer Quindel stated in her decision, disqualification is a "drastic remedy." *Cheatem*, (Rerun Decision) at 115. Whether or not to impose such a remedy is a matter within the discretion of the Election Officer. *Cheatem*, (Carey Disqualification Decision) at 53. In this case, the Election Officer determined that he would not disqualify Carey unless there was evidence that Carey had knowledge of the schemes. *Id.* at 15 (stating that "[i]f Mr. Carey had no knowledge of these schemes, disqualification . . . would be inappropriate [but] [i]f . . . Mr. Carey participated in certain of the schemes or had contemporaneous knowledge of them, then disqualification of Mr. Carey would have to be considered as a possible remedy to these serious violations").

There is no evidence in the record, nor does the Hoffa slate produce any evidence, that any other member of the Carey slate had any knowledge of the improper campaign contribution schemes. The Hoffa slate's argument that such a remedy is warranted because the members of the Carey slate are strictly liable under the Election Rules is without merit. As Election Officer Quindel noted in *Cheatem*, (Rerun Decision):

> [t]his argument confuses the finding of a violation with the choice of a particular remedy. It is correct that if a candidate or slate accepts a prohibited contribution, it has violated the Rules whether it acted with bad intent or complete innocence. . . . Article XII, Section 1(d) of the Rules demonstrates that the choice of remedy is still dependent on the surrounding circumstances.

*Cheatem*, (Rerun Decision) at 117. The Election Officer was well within his discretion not to consider the remedy of disqualification with respect to the other members of the Carey slate.

## IV. CONCLUSION

The remedy of disqualification imposed by the Election Officer in this case is both proportionate to the misconduct at issue, and appropriate to help ameliorate the harm caused by this misconduct. The Election Officer's choice of remedy was not arbitrary nor capricious and thus is AFFIRMED without modification.

SO ORDERED