UNITED STATES of America, Plaintiffs,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Defendants.

No. 88 Civ. 4486(DNE).

United States District Court, S.D. New York.

Sept. 15, 1998.

Martha Walfoort, James & Hoffman, P.C., Washington, DC, for Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO.

## OPINION & ORDER

EDELSTEIN, District Judge.

### BACKGROUND

This opinion emanates from the voluntary settlement of an action commenced by the United States of America against, *inter alia,* the International Brotherhood of Teamsters ("IBT" or "the union") and the IBT's General Executive Board ("GEB"). The settlement is embodied in the voluntary consent order entered March 14, 1989 ("Consent Decree"). The goals of the Consent Decree are to rid the IBT of the hideous influence of organized crime and establish a culture of democracy within the union. The long history of this case has been set forth in this Court's numerous prior opinions. Accordingly, only those facts necessary for resolving the instant application shall be set forth.

After winning the first IBT general election in which members voted for International officers, Ronald Carey ("Carey") took of-

fice in February 1992. In 1996, he sought re-election as General President at the head of a slate of candidates for other International Offices.

The 1996 IBT Election took place in the final months of 1996. Following Election Officer Barbara Zack Quindel's announcements of the winning candidates, post-election protests were filed. Election Officer Quindel conducted an investigation of the post-election protests and uncovered serious violations of the 1996 Election Rules. On August 21, 1997 she issued her decision addressing certain post-election protests. *See In re Jeraldine Cheatem, et al.,* Post–27–EOH (BZQ) (Aug. 21, 1997).

Election Officer Quindel concluded that "[t]he Carey Campaign and each member of the Carey slate violated Article XII, Section 1(b) of the Rules by receiving the use and benefit of [ ] prohibited contributions." *Id.* at 98. Based on these findings, she determined that these impermissible campaign contributions may have affected the outcome of the races of every member of the Carey slate nationwide. Thus, she issued her decision refusing to certify the results of the 1996 Election and ordering a new election for all positions except for those the Hoffa slate won, and that of the President of Teamsters Canada, an uncontested race. *Id.* at 114–15.

Additional evidence surfaced after Election Officer Quindel's decision of August 21, 1997. On September 18, 1997, Jere Nash ("Nash"), Carey's campaign manager; Martin Davis ("Davis"); and Michael Ansara ("Ansara"), each pled guilty in the United States District Court for the Southern District of New York to felonies arising out of their conduct on behalf of the Carey campaign.[1] As part of their respective plea agreements, Nash, Davis, and Ansara each agreed to cooperate fully with the United States Attorney's Office.

Based on this new information, Election Officer Quindel reopened her investigation into whether Carey had knowledge of, or involvement in, the illegal acts these three individuals perpetrated. However, during the course of her inquiry, Election Officer Quindel discovered information that led her to recuse herself from any further investigation. *See* Letter from Barbara Zack Quindel, Election Officer for IBT, to Honorable David N. Edelstein (Sept. 23, 1997). Thus, by Order dated September 29, 1997, this Court designated Honorable Kenneth Conboy as Election Officer "for the sole purpose of investigating and deciding the issue of disqualification of Ronald Carey from the rerun election." *See* September 29, 1997 Order at 2.

After a comprehensive investigation, Election Officer Conboy found that Carey had knowledge of and engaged in extensive violations of the Rules governing the 1996 election. *See In re Jeraldine Cheatem, et al.,* Post–27–EOH (KC) (Nov. 17, 1997). Based on these findings, Election Officer Conboy disqualified Carey from running as a candidate in the rerun election. Thereafter, Carey took an unpaid leave of absence from the position of General President of the IBT on November 25, 1997. On December 2, 1997 Carey appealed to this Court Election Officer Conboy's decision disqualifying him from running as a candidate in the rerun election. This Court affirmed the decision of Election Officer Conboy on December 30, 1997. *See United States v. IBT ("Carey Disqualification"),* 988 F.Supp. 759 (S.D.N.Y.1997). Carey's appeal from this Court's December 30, 1997 decision is currently before the Court of Appeals for the Second Circuit.

### THE IRB DECISION

In addition to its provisions pertaining to the conduct of free and fair elections, the Consent Decree also established an Independent Review Board ("IRB") to oversee the eradication of corruption in the IBT. *See* Consent Decree, ¶ G. From October 1992 through June 30, 1998, the IRB has recommended charges against 229 individuals and has recommended to the IBT that trusteeships be imposed on twenty-one local unions and on one joint council. *See* Statement of the IRB before The Subcommittee on Over-

---

1. Nash pled guilty to one count of conspiracy and one count of making false statements. Davis pled guilty to one count of conspiracy, one count of embezzling union funds and one count of mail fraud. Ansara pled guilty to one count of conspiracy.

sight and Investigations Committee on Education and the Workforce U.S. House of Representatives, July 30, 1998 at 2.

William Hamilton ("Hamilton"), until his resignation on July 29, 1997, was the Director of the IBT's Government Affairs Department and an IBT member. As head of the Government Affairs Department, Hamilton was responsible for recommending what contributions the IBT should make in connection with legislative and political goals. On October 22, 1997, the IRB issued an Investigative Report to the GEB recommending that Hamilton, be charged with bringing:

> reproach upon the IBT by causing a thing of value to be given to another in return for your performance of union duties and you embezzled IBT funds by arranging for IBT donations to certain advocacy groups as part of a scheme in which, in return for the IBT's donations, individuals, directly or indirectly, would donate money to benefit the Ron Carey ("Carey") campaign thereby violating Article II, Section 2(a) and Article XIX, Section 7(b)(1), (2) and (3) of the IBT Constitution.

Decision of IRB In re: Ronald Carey and William Hamilton, July 27, 1998 ("IRB Dec.") at 1. The GEB filed the charge against Hamilton and returned the matter to the IRB for hearing. *Id.*

In addition, on November 25, 1997, the IRB issued an Investigative Report recommending that Carey be charged as follows:

> [i]n breach of your fiduciary obligations, you authorized IBT contributions in October, 1996 to Citizen Action, Project Vote and the National Council of Senior Citizens, totaling $735,000, knowing the contributions would result in a personal benefit to you in money to pay expenses for your re-election campaign. You failed both to disclose that benefit and to give it to the IBT, as your fiduciary duties required. You also failed to exercise your fiduciary obligation to inquire into the circumstances surrounding your co-fiduciary's recommendations of those transactions.

*Id.* The GEB filed the charge against Carey and returned the matter to the IRB for hearing. *Id.*

As previously mentioned, during the 1996 IBT election then-incumbent IBT General President Carey's campaign engaged in a scheme by which IBT funds were manipulated in order to generate contributions to the Carey campaign. In October 1996, the IBT gave $735,000 in political contributions from the IBT treasury to three organizations: (1) $475,000 to Citizen Action, (2) $175,000 to Project Vote, and (3) $85,000 to the National Council for Senior Citizens ("NCSC"). These contributions were part of a leveraged contribution scheme whereby individuals would contribute to the Carey campaign in return for IBT contributions to these political advocacy organizations. As a result of this scheme, these political advocacy organizations generated $185,000 for the Carey campaign.[2] These monies were used to fund the massive, last-minute mailing to IBT members designed to turn out the pro-Carey vote in the election. That mailing and the source of the funds were the basis for the Election Officer's refusal to certify the results of the 1996 election and her call for a rerun election.

On January 20–22 and March 11, 1998, a consolidated hearing regarding the charges against Hamilton and Carey was held before the IRB in Washington, D.C. After hearing days of testimony, reviewing scores of exhibits, considering numerous written submissions, and reviewing post-hearing memoranda, the IRB issued its decision on July 27, 1998, finding that Hamilton had brought reproach upon the IBT and embezzled IBT funds when he knowingly participated in an illegal fund-raising scheme, and found that Carey breached his fiduciary duty and brought reproach upon the IBT by failing to exercise his duty to inquire before approving sizable political contributions that benefitted his campaign. *See* IRB Dec. at 33. The IRB expressly found that Carey both knew of and approved the contributions at issue. *Id.* at 21 ("We can only conclude that at the times in question Carey knew of the pro-

---

2. Teamsters for a Corruption Free Union ("TCFU"), a fund-raising committee the Carey campaign created, ultimately netted a total of $221,000 through this and other schemes.

posed contributions and approved them, and we so find."). The IRB concluded that "[a] fair inference to be drawn from all the facts is that Carey closed his eyes because he knew or suspected that those contributions were to generate a personal benefit for him, *i.e.*, benefits to his Campaign." *Id.* at 33.

Accordingly, the IRB imposed the following penalties:

Hamilton is permanently barred from membership, permanently barred from holding any office or employment relationship with the IBT or its affiliates or otherwise drawing any salary or compensation from any IBT-affiliated source.

Carey is permanently barred from membership, permanently barred from holding any office or employment relationship with the IBT or its affiliates or otherwise drawing any salary or compensation from any IBT-affiliated source.

IRB Dec. at 35.

### *Application LXI of the IRB*

Currently before this Court is Application LXI of the IRB ("Application LXI"), dated July 27, 1998. In Application LXI, the IRB requests "that an Order be entered affirming the IRB's July 27, 1998, Majority Opinion and Concurring Opinion." Application LXI, at 3. Both Carey and Hamilton submitted objections to Application LXI. *See* Mr. Carey's Objections to Application LXI of the Independent Review Board ("Carey Br."); Objections of William Hamilton to Application LXI of the Independent Review Board ("Hamilton Br.").

### *STANDARD OF REVIEW*

It is well established that the findings of the IRB, as the successor to the Independent Administrator, are entitled to "great deference." *See United States v. IBT ("Friedman & Hughes")*, 905 F.2d 610, 616 (2d Cir.1990). In reviewing IRB disciplinary actions, this Court has held that the "arbitrary and capricious" standard of review is applicable. *United States v. IBT ("Portal")*, 908 F.Supp. 139, 143 (S.D.N.Y.1995). Paragraph O of the IRB Rules provides that "[i]n reviewing actions of the IRB, this Court shall apply the same standard of review applicable

to review of final agency action under the Administrative Procedure Act." *See* Rules and Procedures for Operation of the Independent Review Board for the International Brotherhood of Teamsters, ¶ O. Furthermore, the Second Circuit has held that "the [Administrative Procedure Act] generally allows the reviewing court to set aside action only when it is arbitrary and capricious, an abuse of discretion or not in accordance with law." *United States v. IBT ("Wilson")*, 978 F.2d 68, 72 (2d Cir.1992). Consistent with the great deference owed to the IRB's determinations, this Court has made clear that it "will not substitute its assessment of a witness's credibility for that of the IRB." *United States v. IBT ("Simpson")*, 931 F.Supp. 1074, 1096 (S.D.N.Y.1996), *aff'd*, 120 F.3d 341 (2d Cir.1997).

### *DISCUSSION*

#### A. *Carey's Objections*

In his submission to this Court, Carey argues that the IRB's finding that he approved the contributions at issue was "unsupported by the evidence." Carey Br. at 5. He claims that the IRB could not permissibly conclude that he breached his duty to inquire once the IRB declined to rely on an affidavit provided by Monie Simpkins ("Simpkins"), Carey's personal secretary, because "[o]ther than the Simpkins affidavit, there is no evidence anywhere in the record that Mr. Carey was presented with a single one of the disputed contributions, or that he ever personally approved any of them." *Id.* at 6.

The record contradicts Carey's argument. For example, Nash, Carey's campaign manager, testified that after learning from Hamilton that Carey initially rejected the proposed contribution to Citizen Action, Nash had a phone conversation with Carey. Transcript of IRB Hearing re: Charges Against Ron Carey and Bill Hamilton ("Tr."), at 857. Nash testified that during that phone conversation he told Carey that the contribution to Citizen Action "will help Martin Davis in the fund-raising that he is doing for our campaign." *Id.* According to Nash's testimony, Carey replied, "[w]ell, hell, no one ever told me about it," and then approved the contri-

bution. *Id.* Nash further testified "I said, 'Does that mean that this is okay?' And he said, 'Yes, that is fine.'" IRB Dec. at 22–23. Following his conversation with Carey, Nash spoke with Simpkins to advise her that the IBT would be making contributions to certain political organizations and, in return, the Carey campaign would be receiving contributions from certain individuals, and to ask her to call Nash if either she or Carey had any questions about the IBT's contributions. Tr. at 864–65.

Carey devotes a substantial portion of his brief challenging the IRB's conclusion that Nash informed Carey about the contribution to Citizen Action by pointing to Nash's phone records and the IBT's phone records in an attempt to establish that the telephone call Nash described could not have taken place. Carey Br. at 10–14. The IRB flatly rejected this argument. *See* IRB Dec. at 22 n. 16.

Contrary to Carey's suggestion, *see* Carey Br. at 11, Nash testified that when he called Simpkins and asked her to find Carey for him, he did not know whether "she got [Carey] on the phone that minute or whether [Carey] called back." Tr. 856. Carey's arguments regarding Nash's phone records, even if correct, hardly establish that a call did not take place as Nash described in his testimony. Nash testified that he was unsure whether Simpkins was able to connect him to Carey immediately or whether Carey returned Nash's phone call. Tr. at 856; 1027–28. A return phone call from Carey would not be reflected on the records that Carey claims demonstrate that no conversation took place.

Furthermore, there are numerous other statements and testimony that establish that Carey approved the contributions. For example, Hamilton stated in a March 1997 interview with an IBT attorney that he discussed the Citizen Action contribution with Carey. Ex.[3] 27 at 1–2. Hamilton also stated in an interview with the Election Officer in April 1997 that Carey complained to him in November 1996, shortly after the contributions at issue were made, about the use of

funds from the General Treasury. Ex. 20 at 5. Both statements directly refute Carey's assertion that he was unaware of the contributions.

Moreover, the testimony of Gregory Mullenholtz ("Mullenholtz"), who was responsible for processing the paperwork for contributions from the IBT's political action committee, establishes that Hamilton told Mullenholtz, at the time the paperwork for the Project Vote and the NCSC contributions were being processed, that Hamilton "had gone to Mr. Carey directly and had gotten [Carey's] approval" for the two contributions. Ex. 39 at 25. Additionally, Kathleen Marrone, who worked for Carey's Executive Assistant Aaron Belk and who formally initialed the approval of the General President's office on many of the contributions at issue, testified that Simpkins told her that Carey had signed off on the Citizen Action contribution. Ex. 11 at 30.

More importantly, the presence of the initials "RC/ms" on three of the contribution requests (and "ms" on the fourth) provides additional support for the IRB's conclusion that Carey approved the contributions. Carey himself testified that if Simpkins marked his initials on the approval forms for the contributions at issue, then she must have spoken to him about them, even if he did not recall the conversations. Ex. 1 at 44; Ex. 6 at 115–16; IRB Dec. at 14, n. 8. Carey also stated at the IRB hearing that her notation (the initials) was what Simpkins would place on a contribution request after she discussed it with him and he approved the request. *See* Tr. at 760, 783–84; IRB Dec. at 25 n. 17.

Finally, the IRB specifically found incredulous Carey's claimed lack of memory regarding whether he had approved the contributions as well as his later denial that he had been presented with or had approved the requests. *See* IRB Dec. at 21. Carey claimed not to have any recollection of any of the following, all of which occurred within one month: (1) a $500,000 loan to Democrat Republican Independent Voter Education ("DRIVE") (the IBT's Political Action Com-

---

**3.** "Ex." refers to the Independent Review Board Investigative Report's Exhibits, In the Matter of Ron Carey.

mittee); (2) a $475,000 Citizen Action donation; (3) a $175,000 in Project Vote donations; (4) a $85,000 NCSC donation; (5) a $150,000 contribution to the AFL–CIO; and (6) a $73,000 payment authorized for an outside telephone service to make election related calls. IRB Dec. at 20–21. Documents introduced in evidence at the IRB hearing indicated that in four weeks Carey approved all these expenditures totaling $1,458,000 in financial transactions relating to the federal elections. The IRB concluded:

> [Carey's] claims nine months later to the Election Officer, and subsequently, that he had no memory of whether he did or did not approve any of these expenditures totaling $1,458,000, were less than credible given their size and their relation to the federal election which Carey believed to be of vital importance. We can only conclude that at the times in question Carey knew of the proposed contributions and approved them, and we so find.

*Id.*

In his papers to this Court, Carey states that "the sole basis for the IRB's lifetime ban on Mr. Carey was its conclusion that Mr. Carey breached his fiduciary duty to inquire into the purpose of the IBT's political action contributions in the fall of 1996." Carey Br. at 24. He argues that the IRB erred in finding that he had a duty to inquire because "[t]his supposed duty to inquire ... arose only from Nash's supposed comment to [him] that the Citizen Action contribution would be good for fund-raising." *Id.*

■ Carey, as the General President of the IBT, had fiduciary obligations to the members in handling the union's money. 29 U.S.C. § 501(a); *United States v. Boffa,* 688 F.2d 919, 930–31 (3d Cir.1982); *Morrissey v. Curran,* 650 F.2d 1267, 1275 (2d Cir.1981); *United States v. IBT ("Coli"),* 803 F.Supp. 748, 755 (S.D.N.Y.1992). Although the majority of the IRB acknowledged that it was not conclusive that Carey actually knew of the scheme,[4] the IRB held that the information before Carey did "impose on [him] a

fiduciary duty to inquire further about any relation or tie between [his] own campaign fund-raising and the IBT's payment to an advocacy group like Citizen Action." IRB Dec. at 23.

■ Additionally, there is ample evidence, as well as the IRB's credibility determinations, to support the IRB's conclusion that Nash informed Carey that approving the Citizen Action contribution would help Davis raise money for the Carey campaign. This finding alone supports the charges against Carey. It also clearly imposed on Carey a fiduciary duty to inquire further about any relation between the Carey campaign's fund-raising and the IBT's payment to Citizen Action. Furthermore, as the IRB found, even apart from Nash's conversation with Carey, the circumstances surrounding the contributions, including Carey's failure to receive and review information his staff proffered before making a decision, his failure to return phone calls from his ranking assistant regarding the contributions, and his lax procedure for approving such large contributions over the telephone, established a fiduciary duty of inquiry that Carey utterly failed to exercise. *See* IRB Dec. at 23–25, 32–33; Chief Investigator's Memorandum of Law in Support of the IRB's Application LXI at 50–56.

Moreover, Carey's arguments that the IRB was wrong in crediting Nash's testimony and finding Carey's denials and claims of failed memory incredible are without merit. *See* Carey Br. at 17–24 (asserting that Nash "[i]s A Confessed Perjurer With An Overwhelming Motive To Lie"). The IRB's determinations regarding the credibility of Carey and Nash were based, in part, on Carey's and Nash's testimony before the IRB. The IRB had the opportunity to observe their demeanor, to consider their responses during both direct and cross examination, to ask them questions, and to evaluate their testimony in light of both the extensive record before it and the parties' arguments about the credibility determina-

---

4. Honorable Frederick B. Lacey, in his concurring opinion, stated that "unlike my colleagues, I find that Carey did know that the contributions were to result in a benefit to his campaign."

Concurring Opinion of Frederick B. Lacey, In re: Ronald Carey and William Hamilton, July 27, 1998, at 1.

tions the IRB should make. This Court and the Second Circuit have stated that because the Consent Decree officers conduct the disciplinary hearings, they are "best equipped to evaluate the demeanor, credibility and, ultimately, the culpability of those who appear before [them]." *United States v. IBT ("DiGirlamo")*, 824 F.Supp. 410, 418 (S.D.N.Y.1993), *aff'd*, 19 F.3d 816, 819–20 (2d Cir.), *cert. denied*, 513 U.S. 873, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994); *see also United States v. IBT ("Cimino")*, 964 F.2d 1308, 1313 (2d Cir.1992) (refusing to re-weigh evidence or question credibility determination the Independent Administrator made).

■ There is also ample support for the IRB's determination that Carey's denials are unbelievable. Carey's claim that he has no memory of whether or not he approved expenditures totaling $1,458,000 in the span of a single month on political expenditures, considering their size and relation to the federal elections, is utterly unworthy of credence. Therefore, this Court finds that the record fully supports the IRB's credibility determinations and that they should not be disturbed.

Carey next argues that this Court's refusal to give him access to its subpoena power deprived him of a full and fair hearing to which he was entitled under the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(5) ("LMRDA"). *See* Carey Br. at 31. This Court has previously rejected Carey's arguments that he must be granted the power to subpoena in order to receive a full and fair hearing under LMRDA. *See United States v. IBT ("Carey Subpoenas")*, 992 F.Supp. 598 (S.D.N.Y.1998). Carey offers no basis to disturb that decision.

■ Finally, Carey argues that the IRB acted arbitrarily and capriciously by imposing a "grossly disproportionate" sanction. He argues that this Court should overturn his sanction because it is inconsistent with penalties imposed in other proceedings. Carey Br. at 34–37. "Permanent suspension," he asserts, "has, almost invariably, been reserved for involvement with organized crime...." *Id.* Carey argues that permanent suspension "has never, to [his]

knowledge, been imposed for negligence, *i.e.*, breaching a fiduciary duty by failing to inquire." *Id.*

Even assuming that Carey could demonstrate some discrepancy between the penalty imposed upon him and the penalties imposed in prior proceedings, it is the province of the IRB to determine the appropriate punishment in each proceeding. *See Sansone*, 981 F.2d at 1372 (stating that "the apparent discrepancy between the penalty imposed here and those imposed in other cases does not inexorably compel the conclusion that the Independent Administrator acted arbitrarily or capriciously"). Furthermore, contrary to Carey's suggestion that the IRB found that his only wrongdoing was nonfeasance, *see* Carey Br. at 37, the IRB found that Carey committed "serious breaches of trust" that "require severe sanctions." IRB Dec. at 34. The IRB stated that "[b]y his entire course of conduct [Carey] abdicated his fiduciary responsibilities." *Id.* at 32. The IRB concluded that "[a] fair inference to be drawn from all the facts is that Carey closed his eyes because he knew or suspected that those contributions were to generate a personal benefit to him, i.e., benefits to his Campaign." *Id.* at 33.

Moreover, the IRB specifically noted that "[a]s the top elected official of the IBT, Carey was especially obligated to follow the[ ] rules, particularly as to financial transactions of the size involved here and in light of his constitutional obligation to review expenditures." *Id.* at 34. Therefore, the IRB could properly conclude that because of Carey's position as the highest union official, his misconduct was more serious. *See, e.g., Simpson*, 120 F.3d at 349 ("It was well within the IRB's discretion to conclude that, precisely because Simpson was a trusted, high-level official in the IBT, his conduct ... was more culpable.").

Carey's breach of his fiduciary duty resulted in the misuse of $735,000 of union funds. As a result of his conscious avoidance and deliberate inaction, the 1996 IBT election had to be overturned, depriving the union membership of their right to a free, fair, democratic and honest election. The IRB noted

correctly that "permanent expulsion and permanent ineligibility for holding office have been applied in different, and lesser situations, and [are] called for in this situation." IRB Dec. at 35. The penalty imposed on Carey is well within the IRB's discretion and is fully supported by the evidence. There has been no case since the implementation of the Consent Decree in which the wrongdoing resulted in as much harm to the IBT and its members and so directly undermined a central provision of the Consent Decree—an honest and fair general election—as was done here. Therefore, this Court finds that the decision of the IRB regarding the charges against Carey and the IRB's choice of sanction are neither arbitrary nor capricious.

## B. *Hamilton's Objections*

Hamilton raises two arguments in his papers to this Court. First, he contends that the IRB denied him a fair hearing by: (1) denying his request to stay the IRB proceedings pending the outcome of criminal proceedings against him; and (2) denying his request to issue subpoenas on his behalf. *See* Hamilton Br. at 1–3. Second, Hamilton asserts that the IRB's Decision was unsupported by the evidence. *See id.* at 6.

■ Hamilton's argument that he was denied a full and fair hearing under section 101(a)(5)(C) of the LMRDA is without merit. Courts reviewing internal union disciplinary actions should intervene under section 101(a)(5) "only if there has been a breach of fundamental fairness." *Ritz v. O'Donnell*, 566 F.2d 731, 737 (D.C.Cir.1977). Here, the IRB gave Hamilton advance, written notice of the charges against him, and provided him with all of the documentary evidence supporting those charges. At the hearing, Hamilton was represented by counsel and was given the opportunity to be heard and to present witnesses and evidence in his defense.

■ Hamilton argues that he did not receive a full and fair hearing because the IRB denied his two requests to stay the IRB proceeding pending the outcome of federal criminal proceedings against him. Hamilton Br. at 2. Hamilton claims that, as a result,

"[t]he IRB placed [him] at a distinct disadvantage by requiring him to defend the Chief Investigator's charges when there was the possibility that any evidence offered by him could be used in the criminal investigation." Hamilton Br. at 2. This argument also fails.

This Court has previously ruled that IRB proceedings need not be stayed because of pending criminal proceedings related to the same matter. *See United States v. IBT ("Hickey")*, 945 F.Supp. 96, 99 (S.D.N.Y. 1996) ("Because the Fifth Amendment is unavailable to a union member called to sworn examination before an internal disciplinary body, this Court finds that it does not support Hickey's request to stay the IRB examination...."). Given that one of the principal goals of the Consent Decree is to rid the union of corruption, there were compelling reasons in this case not to allow the pendency of related criminal proceedings to delay IRB disciplinary proceedings. Thus, because the IRB's determination not to stay the proceedings against Hamilton was correct, it did not render the IRB's Decision arbitrary and capricious.

■ Hamilton also argues that he was denied a full and fair hearing because the IRB refused to issue subpoenas to compel the production of certain documents, and refused to compel the appearance of Davis. He contends that this refusal "prevented [him] from confronting Davis, one of his chief accusers, and obtaining highly relevant and exculpatory documents." Hamilton Br. at 3.

Hamilton, however, cites no authority to support his claimed entitlement to subpoena witnesses and documents in connection with an internal union disciplinary proceeding. In fact, it is well established that a "full and fair" hearing does not require that a union member have the power to subpoena witnesses to appear at his disciplinary hearing. *See United States v. IBT ("Nunes")*, 962 F.2d 4, Order at 3 (2d Cir.1992); *see also Carey Subpoenas*, 992 F.Supp. 598, 600 (S.D.N.Y.1998); *United States v. IBT ("Simpson Subpoenas")*, 870 F.Supp. 557, 560–61 (S.D.N.Y.1994).

Furthermore, this Court addressed Hamilton's arguments under section 101(a)(5) of

the LMRDA when it denied Hamilton's application for an order authorizing the issuance of subpoenas. *See United States v. IBT ("Hamilton Subpoenas"),* 992 F.Supp. 601 (S.D.N.Y.1998). In that decision, this Court reasoned that the LMRDA cannot be deemed to provide subpoena power to IBT members facing disciplinary hearings where neither the IBT Constitution nor the Consent Decree confers such authority upon IBT members. *Id.* Therefore, this Court finds that there has been no breach of fundamental fairness and that Hamilton received a full and fair hearing as section 101(a)(5)(C) of the LMRDA requires.

■ Hamilton's second argument is that "the weight of the evidence" did not establish that he knowingly participated in the scheme and that the IRB should not have given "any weight" to the testimony of Nash. Hamilton Br. at 1, 6. Again, this argument has no legal basis. As this Court previously stated, the IRB is best equipped to make credibility determinations of the witnesses who appear before it, and, therefore, this Court should not second-guess such determinations or reweigh the evidence, unless the record reveals that such determinations were clearly erroneous. *See Cimino,* 964 F.2d 1308, 1313 (2d Cir.1992); *Simpson,* 931 F.Supp. 1074, 1096 (S.D.N.Y.1996), *aff'd,* 120 F.3d 341 (2d Cir. 1997); *DiGirlamo,* 824 F.Supp. 410, 418 (S.D.N.Y.1993), *aff'd,* 19 F.3d 816, 819 (2d Cir.), *cert. denied,* 513 U.S. 873, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994). The IRB's determinations are fully supported by the record and thus, are not clearly erroneous.

■ The IRB found that "Hamilton knowingly participated in the scheme in which IBT donations were made with the understanding that, in return, donations would be made to benefit the Carey campaign." IRB Dec. at 19. Specifically, the IRB found that Hamilton spoke with Nash about the scheme, Hamilton agreed to seek approval for the contributions and Hamilton recommended contributions to the groups identified by Davis. *Id.* Furthermore, the IRB concluded that Hamilton "knowingly used his union position to cause union donations to be made in return for contributions to the Carey campaign." *Id.* at 30. The IRB determined that

Hamilton embezzled IBT funds and possessed the "fraudulent intent" to do so. *Id.* The record amply supports the IRB's determination.

For example, Nash testified that he discussed the scheme with Hamilton, that he explained to Hamilton that it would raise money for the Carey campaign, and that Hamilton agreed to participate in the scheme. *See* Tr. at 852–53. Nash further testified that he specifically discussed with Hamilton the contributions to Citizen Action, to Project Vote and to the NCSC. *See, e.g.,* Tr. at 855–59. In addition, the record includes memoranda that Hamilton drafted requesting that the IBT make each of the contributions Nash and Davis called for. Moreover, Hamilton did not offer an explanation as to how these contributions could have been made without his recommendation. This evidence provides more than ample support for the IRB's findings that Hamilton was a knowing participant in the scheme and that he embezzled IBT funds.

■ Therefore, this Court finds that the decision of the IRB with regard to the charges against Hamilton is neither arbitrary nor capricious. Moreover, this Court finds that the sanction the IRB imposed is not unwarranted in law or without justification in fact.

## C. The Associational Ban on Carey and Hamilton

■ Both Carey and Hamilton contend that the associational ban in Paragraph E(10) of the Consent Decree should not be applied to them. *See* Carey Br. at 37–41; Hamilton Br. at 6 n. 4. Paragraph E(10) of the Consent Decree enjoins IBT officers, representatives, members and employees from "knowingly associating with ... any person otherwise enjoined from participating in union affairs...." Consent Decree ¶ E(10). Carey argues that "the rationale for the associational ban is to protect and insulate IBT officers and members from contact with persons involved in ongoing organized criminal enterprises." Carey Br. at 38. Therefore, he asserts that "an associational ban would serve no legitimate purpose and is not neces-

sary to insulate IBT members from exposure to a person found guilty of ongoing corruption or criminal enterprise." *Id.* at 40.

Carey's and Hamilton's requests for preferential and exceptional treatment with regards to the associational ban must be denied. The IRB determined that, as a result of their conduct, both Carey and Hamilton are to be permanently barred from the IBT. Therefore, both Carey and Hamilton clearly fall within the scope of Paragraph E(10).

Contrary to Carey's claim, the associational ban also serves to protect IBT officers and members from people of dubious character. The true test of one's character is what one does when one believes nobody is watching. Both Carey and Hamilton, through their conduct during the 1996 IBT election have exhibited shoddy characteristics to this Court. Paragraph E(10) provides no exceptions based on the stated reasons for the permanent bar, and this Court finds no basis to grant Carey or Hamilton exceptional treatment.[5] Therefore, this Court finds that the Paragraph E(10) associational ban is applicable to both Carey and Hamilton.

### Conclusion

Based upon the foregoing, Application LXI of the IRB is Granted and the IRB Decision is Affirmed in all respects.

SO ORDERED

---

**5.** In his papers to this Court, Carey requests "[a]t a bare minimum, the Court should make clear that Mr. Carey's son, also a member of the IBT, would not be subject to discipline for associating with his father." Carey Br. at 41. The associa-tional ban does not prohibit solely familial or "incidental" contacts with persons subject to the ban. *See, United States v. IBT ("DiGirlamo")*, 19 F.3d 816, 823 (2d Cir.1994).