UNITED STATES,

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al.,**
Defendants.

**No. 88 CV 4486 (LAP).**

United States District Court,
S.D. New York.

Aug. 18, 2009.

J. Bruce Maffeo, J. Bruce Maffeo, Esq., Larry Cary, Cary Kane LLP, New York, NY, Martha Walfoort, James & Hoffman, P.C., Washington, DC, Nancy B. G. Lassen, Willig, Williams & Davidson, Philadelphia, PA, for Defendant.

Thomas James McKenna, Gainey & McKenna, LLP, Andrew S. Hoffman, Wiseman & Hoffmann, Linda H. Chan, Independent Review Board Chief Investigator's Office, Ellen Yaroshefsky, Clayman & Rosenberg, Celia A. Zahner, Chief Investigator's Office, New York, NY, John W. Morris, Philadelphia, PA, Barbara Har- vey, Detroit, MI, Robert L. Vogel, Washington, DC, for Movants.

## MEMORANDUM AND ORDER

RE: IRB APPLICATION 131 (DON HAHS)

LORETTA A. PRESKA, Chief Judge.

The Independent Review Board ("IRB") of the International Brotherhood of Teamsters ("IBT") submitted Application 131 concerning disciplinary action taken against Don Hahs ("Hahs"), former National President of the Brotherhood of Locomotive Engineers and Trainmen ("BLET"), a division of the IBT's Rail Conference. Based on the recommendation of the IRB, Hahs was charged with breaching his fiduciary duty to ensure that union funds be spent only for union purposes. Despite the voluminous exhibits received at the hearing, the case is really quite straight forward. Hahs was charged with causing the BLET to pay for Cleveland Cavalier playoff and season tickets, his wife's travel expenses, and other personal expenses for which there was no union purpose. The charge was upheld by the IBT after a trial before a hearing panel. Following the submission of objections by Hahs, the IRB found that the IBT's decision upholding the charge against Hahs was "not inadequate."

For the reasons set forth herein, Application 131 is granted, and the IRB's "not inadequate" finding with regard to the charge against Hahs is upheld.

## BACKGROUND

A. *Proceedings Regarding the IRB–Recommended Charge Against Hahs*

On September 13, 2007, the IRB referred to the IBT its charges that Hahs had embezzled and breached his fiduciary duty by causing the BLET to pay for non-

union related expenses, in violation of Article II, Section 2(a), and Article XIX, Sections 7(b)(1), (2), and (3) of the IBT Constitution. *See* Application 131, Ex. A, at 2. Specifically, the IRB recommended that the IBT file charges against Hahs for causing the BLET to purchase Cleveland Cavalier playoff and season tickets for the 2004–2006 seasons. *Id.* at 5–14. The IRB also recommended that the IBT file charges against Hahs for causing the BLET to incur expenses for his wife, Janice Hahs, who was not a BLET member or employee, to travel to numerous BLET events and for his grandson, Derek Hahs, to attend BLET events. *Id.* at 15–38.

On September 24, 2007, the IBT's General President James P. Hoffa ("IBT President Hoffa") filed the IRB-recommended charges. *See* Ex. C. Hahs' counsel requested that the charges be referred to the IRB for "further proceedings" because the charges were "complex" and would involve interpretation of the merger agreement under which the BLET became a division of the IBT. *See* Ex. B. The IBT granted Hahs' request to refer the matter to the IRB. *See* Ex. C. By letter dated October 16, 2007, the IRB notified the IBT of its determination that "there is no basis for a request for the IRB to hear this matter." Ex. F. The IRB referred the charges back to the IBT, and IBT President Hoffa appointed a panel to hear the charges against Hahs. *See* Ex. G. The three members of the hearing panel were Denis Taylor, President of Teamsters Local 355, Stan Hennessy, President of Teamsters Local 31, and Robert Svob, Jr., a BLET member. *See* Ex. K, at 1–5.

The hearing panel heard testimony from Hahs, who was represented by counsel, and seven witnesses called by Hahs on February 4, and 5, 2008. *See* Ex. K, at 1–5, 261–63. By letter dated March 14, 2008, IBT President Hoffa advised Hahs that he

had adopted the Report and Recommendation of the hearing panel (1) holding that Hahs "improperly caused the Union to expend funds where there was no Union purpose for the expenditures and in circumstances that were calculated to benefit himself personally," Ex. L, at 11–14, and (2) recommending that Hahs be fined $44,963.97, the net expenditure by the BLET for the Cleveland Cavalier tickets and the travel expenses of Janice Hahs, that Hahs be removed from BLET office and employment until 2010, the end of his term as BLET President, and suspended from BLET membership for one year, *see id.* at 14–16 (the "IBT Decision").

Hahs submitted his objections to the IBT Decision to the IRB on May 1, 2008, asserting that (i) he was erroneously fined the entire cost of the Cleveland Cavalier tickets because the tickets had been used by other BLET members, *see* Ex. 0, at 6; (ii) the imposition of a fine in the amount of his wife's travel expenses ignored testimony regarding the BLET's "long traditions and practices" regarding the travel of spouses, *see id.* at 8; and (iii) "the promise of autonomy extended by the IBT to the BLET in the unions' 2004 merger requires reversal of the fine assessed by the IBT in these proceedings," *see id.* at 13–15. By letter dated May 13, 2008, the IRB advised Hahs of its determination that the IBT Decision was "not inadequate."

### B. *Application 131*

On June 19, 2008, the IRB submitted to this Court Application 131, seeking a ruling upholding May 13, 2008 decision finding that the IBT Decision was "not inadequate."

The Consent Decree provides that the IRB shall monitor disciplinary actions taken by any IBT entity on IRB-recommended charges to determine whether the charges were "pursued and decided" by

that IBT entity "in a lawful, responsible, or timely manner" and whether the resolution of those charges is "inadequate under the circumstances." Consent Decree ¶ G(f); *see also* IRB Rules ¶ I(7).

Although the Consent Decree contains no express procedure by which a union member disciplined by an IBT entity on IRB-recommended charges may appeal such a "not inadequate" determination to this Court, the IRB has followed a practice of facilitating judicial review of its "not inadequate" determinations when a charged party demonstrates his intention to seek review of a "not inadequate" finding. *See United States v. IBT (Gillen)*, 88 Civ. 4486(LAP), 2008 WL 2743695, at *2 (S.D.N.Y. July 14, 2008); *see also United States v. Boggia*, 167 F.3d 113, 120 (2d Cir.1999) (upholding district court's affirmance of IRB "not inadequate" determination); *Sombrotto v. IBT*, No. 01 Civ. 9285(LAP), 2003 WL 252156, at *4 (S.D.N.Y. Feb. 3, 2003) ("This Court may also review IRB determinations that union discipline is 'not adequate' when requested by the IRB."). Accordingly, the IRB submitted Application 131, by which the IRB requested that the Court adopt the IRB's determination that the IBT handling of the charge against Hahs was "not inadequate."

*Discussion*

I. Standards of Review

A. *Review of IRB Decisions*

■ The standards governing review of IRB disciplinary decisions are well established. This Court reviews determinations made by the IRB under an "extremely deferential standard of review." *United States v. IBT ("Carey & Hamilton")*, 247 F.3d 370, 379 (2d Cir.2001); *United States v. IBT ("Simpson")*, 120 F.3d 341, 346 (2d Cir.1997); *United States v. IBT ("DiGirlamo")*, 19 F.3d 816, 819–20 (2d Cir.1994), *cert. denied*, 513 U.S. 873, 115 S.Ct. 199,

130 L.Ed.2d 130 (1994). The IRB Rules, which were approved by this Court and the Court of Appeals, provide for review of decisions of the IRB under "the standard of review applicable to review of final federal agency action under the Administrative Procedure Act." IRB Rules ¶ O; *see United States v. IBT ("IRB Rules")*, 803 F.Supp. 761, 805–06 (S.D.N.Y.1992), *aff'd as modified*, 998 F.2d 1101 (2d Cir.1993). Under this extremely deferential standard, an IRB decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Carey & Hamilton*, 247 F.3d at 380 (quoting 5 U.S.C. § 706(2)(A)).

■ In accordance with that standard, this Court reviews "the IRB's findings of fact for 'substantial evidence' on the whole record." *United States v. IBT ("Giacumbo")*, 170 F.3d 136, 143 (2d Cir. 1999). "The substantial evidence test is deferential." *Id.* "Substantial evidence is 'something less than the weight of the evidence,'" *Simpson*, 120 F.3d at 346 (quoting *DiGirlamo*, 19 F.3d at 820), "but something 'more than a mere scintilla,'" *id.* (quoting *United States v. IBT ("Cimino")*, 964 F.2d 1308, 1311–12 (2d Cir. 1992)). "Substantial evidence includes such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotations omitted). Moreover, the mere possibility of drawing two inconsistent conclusions from the evidence does not prevent the IRB's findings from being supported by substantial evidence. *Carey & Hamilton*, 247 F.3d at 380 (citations omitted). The IRB's findings cannot be overturned merely by identifying alternative findings that could potentially be supported by the evidence. *See Arkansas v. Oklahoma*, 503 U.S. 91, 113, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) ("The court should not supplant the agency's findings merely by identifying

alternative findings that could be supported by substantial evidence."). Rather, the Court must find that the evidence "not only supports [a contrary] conclusion, but *compels* it." *INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (emphasis supplied).

### B. *Fiduciary Duty of Union Officers*

■ The nature of the fiduciary duty owed to the Union by its officers is also well-settled. "As a fiduciary, an IBT officer enjoys the trust of the general membership. In exchange for this privilege, each officer is bound to serve the membership's interest." *United States v. IBT ("Ross"),* 826 F.Supp. 749, 756 (S.D.N.Y. 1993), *aff'd,* 22 F.3d 1091 (Table) (2d Cir. 1994) (internal marks omitted); *see also United States v. IBT ("Sansone"),* 981 F.2d 1362, 1368 (2d Cir.1992) ("Every IBT officer is a fiduciary with respect to the Union members, and has a duty to disclose and remedy wrongdoing by the IBT.") (internal marks omitted). The Court of Appeals has held the duty to be expansive, noting that it is the duty of each Union official "to refrain from dealing with the [IBT] as an adverse party ... in *any matter* connected with his duties." *Carey & Hamilton,* 247 F.3d at 381 (emphasis added). Nor is an officer's fiduciary duty satisfied through "passivity and willful ignorance." *United States v. IBT ("Sansone"),* 792 F.Supp. 1346, 1354 (S.D.N.Y. 1992), *aff'd,* 981 F.2d 1362 (2d Cir.1992). IBT officers cannot avoid responsibility "by shutting their eyes to allegations" that their fellow IBT members engage in corrupt or improper activity. *United States v. IBT ("Coli"),* 803 F.Supp. 748, 755 (S.D.N.Y.1992).

### II. Application

Applying these standards, the IRB's determination with respect to Hahs is easily affirmed. The IRB acted well within its discretion when it upheld the IBT Decision finding that Hahs had breached his fiduciary duty by causing the BLET to expend union funds for non-union purposes. The IRB also acted within its discretion in upholding the penalty imposed on Hahs—a fine in the amount of the BLET's net expenditures for the Cleveland Cavalier tickets and Janice Hahs' travel expenses, removal from BLET office and employment until 2010, and suspension from BLET and IBT membership for one year.

### A. *The IRB's Decision Upholding the IBT's Finding that Hahs Breached His Fiduciary Duty is Supported by Substantial Evidence*

■ The IRB acted well within its discretion in upholding the IBT's finding that "Hahs improperly caused the Union to expend funds where there was no Union purpose for the expenditures and in circumstances that were calculated to benefit himself personally." *See* Ex. L, at 10–14.

As National President of the BLET, Hahs had a fiduciary obligation to ensure that union funds were used only for union purposes. *See* 29 U.S.C. § 501(a) (duty of union officers to "hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws"); IBT Constitution, Article XIX, Section 7(b)(3) (prohibiting embezzlement or conversion of funds); *see also Carey and Hamilton,* 247 F.3d at 381 (IBT President "had fiduciary obligations to IBT members in handling the union's money").

Substantial evidence in the record supports the IBT's finding that Hahs caused the BLET to incur expenses for (1) Cleveland Cavalier tickets for the 2004–2006 seasons, which were not used for union purposes; and (2) his wife's travel to union

meetings and events, for which she had no identifiable union role. None of the objections raised by Hahs is sufficient to undermine the IBT's decision, as affirmed by the IRB in its "not inadequate" finding.

1. Purchase of Cleveland Cavalier Tickets from 2004–2006

As the IBT noted in its decision, courts have recognized the "potential impropriety of using union funds to purchase sports tickets for use by union officers." *See* Ex. L, at 10 (citing *Brink v. DaLesio*, 496 F.Supp. 1350, 1364 (D.Md.1980), rev'd in part on other grounds, 667 F.2d 420 (4th Cir.1982)); *cf. United States v. IBT ("Perrucci")*, 965 F.Supp. 493, 501–02 (S.D.N.Y. 1997) (affirming IRB-referred kickback charges regarding receipt of free Yankees tickets). For the following reasons, substantial evidence supports the IBT's decision finding that Hahs breached his fiduciary duty when he caused the BLET to purchase Cleveland Cavalier tickets for the 2004–2006 seasons.

First, the record evidence supports the IBT's conclusion that Hahs "maintained control over the tickets" and used them for his personal benefit. Ex. L, at 11. There is no dispute as to the following facts in the record: (1) Hahs caused the BLET to purchase playoff and season tickets, *see* Ex. 1, 70–75; Ex. L, at 11–12; Ex. 5, at 167, which cost $47,880 over three years, Exs. 8, 10–16; (2) Hahs kept the tickets in his office drawer and only gave them to others for distribution when he was out of town, *see* Ex. 1, at 72–73; (3) Hahs attended no fewer than 19 games himself, with his wife or with his grandson, including two of three playoff games in 2006, *see* Ex. 1, at 70, 74–75, 86–91, Ex. K, at 420–21; (4) Hahs kept no records regarding other individuals' use of the tickets, *see* Ex. 1, at 72–75, 83; Ex. 5, at 176–77; and (5) eight days after the IRB conducted sworn examinations during which various BLET officers and BLET employees were questioned about the purchase of Cleveland Cavaliers tickets, on April 20, 2007, the BLET cancelled the seat/license agreement with the Cleveland Cavaliers. (Ex. L at 4; Exs. 98–99). Accordingly, the IBT properly found that Hahs controlled and used the Cleveland Cavaliers tickets.

The IBT also found that Hahs failed to demonstrate any union purpose for the purchase of the tickets. *See* Ex. L, at 11. Hahs claimed that the tickets were purchased to support the city of Cleveland and the Cleveland Cavaliers team but failed to explain how these interests relate to any identifiable union purpose. *See* Ex. 1, at 71–72. To the contrary, however, the IBT found, Hahs' repeated efforts to justify the tickets as a way to help the City of Cleveland and the Cleveland Cavaliers manifest an obvious lack of Union purpose for the tickets. He repeated this clearly non-Union related purpose during his testimony when he expressed his concern that Cleveland was in danger of losing the Cavaliers to another city. He was free to support Cleveland and its home team on his own dime, but there is no justification for spending members' dues money for this purpose. (Ex. L at 11). The IBT therefore properly concluded that Hahs' proffered reasons "manifest[ed] an obvious lack of Union purpose for the tickets." *See* Ex. L, at 11.

The IBT also properly rejected Hahs' other proffered reason for purchasing the tickets, which was that the tickets were purchased as a marketing tool to attract new tenants to the BLET's Standard Building in Cleveland. *See* Ex. 1, at 71, 76–77, 82–84. The BLET established the BLET Building Association ("Building Association"), a non-profit Ohio corporation, to hold and operate the Standard Building, a 24-story office building in Cleveland, Ohio, which the BLET owned. (Ex. 4;

Ex. 5 at 8, 162–163). In 2004, 2005 and 2006, Hahs caused the Building Association to purchase season tickets to Cleveland Cavaliers basketball games. (Ex. L at 8, 11–12, 16; Ex. 5 at 167–172, 184). From 2004 to 2006, Hahs directed National BLET Secretary–Treasurer William Walpert ("Walpert") to use funds from the Building Association's checking account to purchase regular season and playoff tickets. (Ex. L at 3; Ex. 1 at 71–74, 76, 80–84; Ex. 5 at 167, 170, 184). The funds expended were $13,120, $21,860 and 12,900 respectively for a total of $47,880 for the three years. (Ex. 8; Exs. 10–16). As the IBT found, "Hahs then caused the BLET to issue corresponding payments to the Building Association that matched each payment from the Building Association to the Cleveland Cavaliers for the tickets. So, in reality, the tickets were purchased by the Union." (Ex. L at 3; Exs. 8–14, 18). After taking into account credits and refunds, the BLET's net expenditure for the tickets was $37,012 between January 2004 and December 2006. (Ex. L at 14–15). The record evidence fails to support Hahs' contention that the tickets were primarily a marketing tool. There is no evidence in the record that any tenant or prospective tenant used any of the tickets from 2004–2006, including, as noted above, the playoff tickets. Indeed, the IBT found that "the sole occasion on which tickets were provided to any tenant or prospective tenant occurred in May 2007, at least a month after questions regarding the tickets were raised with Hahs during his sworn IRB examination." Ex. L, at 12; see also id. at 8. The tickets were never offered or conveyed to the building manager, Michael Loomis, even though Loomis was responsible for leasing space to new tenants and had been charged with previous marketing initiatives, such as ordering calendars as tenant gifts. See Ex. 1, at 76–77; Ex. K, at 477–78; Ex. 125, at 33–39, 40–43. Instead, Hahs, who had no professional responsibilities for or interaction with the tenants, kept the tickets in his office drawer and by himself decided who would use them. See Ex. 1, at 72–75; cf. Perrucci, 965 F.Supp. at 501–02 (affirming IRB-referred charges where there was "no formal ticket distribution mechanism, and no records exist concerning the ultimate recipients of the Yankee tickets.").

The lack of records relating to the use of the tickets also undermines Hahs' claim that the tickets were purchased to attract new clients. According to Loomis, with previous marketing initiatives, lists had been kept of tenants receiving gifts or promotions, e.g., calendars, and the gifts for all tenants did not usually exceed $1,200 in total. See Ex. 125, at 49–50. The most costly initiative Loomis recalled was giving umbrellas to tenants, which cost $7,680. See id. at 51–53. In contrast, the total expenditure for the Cleveland Cavalier tickets was $47,880, see Exs. 8, 10–16, and no records were kept with regard to tenants who were offered or used the tickets, see Ex. 1, at 72–75, 83; Ex. 5, at 176–77. These facts do not suggest any real intention to use the tickets to attract new tenants for the Standard Building. For these reasons, the IBT's finding that Hahs caused the BLET to purchase the Cleveland Cavalier tickets for non-union purposes was supported by substantial evidence, and the IRB properly found the decision "not inadequate."

2. Travel Expenses of Janice Hahs

The IBT found that, "Hahs breached his fiduciary duty to the Union and its members by causing the Union to pay for his wife's travel expenses, as well as for an excessive number of in-room movies and for his grandson's registration at several Union events." (Ex. L at 13–14). More specifically, the evidence showed that Hahs caused the BLET to pay for his

wife's travel expenses for which there was no union purpose. Hahs caused the BLET to pay for his wife's airline tickets and registration fees at various BLET and non-BLET functions throughout the country. She was never a member of the union, and her presence at the functions was not for a union purpose. (Ex. L at 9, 13; Ex. 1 at 41, 45; Ex. 5 at 65). Between January 2004 and December 2006, Hahs caused the BLET to pay $7,951.97 in personal travel expenses for his wife. (Exs.56, 67–68, 74).[1] Payment for spouses to accompany officers is a nonunion expense. *Investigations Officer v. Baccaro,* Decision of the Independent Administrator (June 23, 1992).[2]

Hahs charged his wife's travel expenses on the BLET's credit card. (Ex. L at 5, 9, 13–14; Exs. 56, 67–68, 74). Although Hahs claimed that some of his wife's travel was connected to the Grand International Auxiliary ("GIA"), his wife never served as an officer or a delegate of the GIA. (Ex. L at 5, 9, 13). The GIA is an organization that "exists to support the interest and welfare of the Brotherhood of Locomotive Engineers and Trainmen." (Exs.49–51, 53–54).[3]

From 2004 to 2006, Hahs caused the BLET to pay $1,687.70 for his wife's expenses, such as airfare and registration fees, to attend various BLET regional conferences. (Exs. 37–47; Exs. 56–63, 67).[4] In addition to these regional conferences, Mrs. Hahs also accompanied her husband, at union expense, on other trips. Between January 2004 and December 2006, Hahs caused the BLET to pay $6,264.27 for his wife's airline tickets for these additional trips. (Ex. 1 at 97–98, 110–111; 120–122, 147–150, 167–168, 188–191, 213–214, 233–234, 240–241, 257–258; Ex. 28; Exs. 56–63; Exs. 68–91; Ex. 95; Exs. 100–101).

The IBT's finding that Hahs breached his fiduciary duty by seeking reimbursement for his wife's travel expenses is also supported by substantial evidence because Hahs failed to identify any union purpose for his wife's attendance at these meetings.

First, the IBT properly found that the BLET's travel policy only addresses the travel of BLET employees and has no provision for the travel of spouses. *See* Ex. L, at 13. The policy provides for reimbursement to "employees for all reasonable and necessary expenses while traveling on authorized organization business." *See* Ex. 107 (emphasis added). As noted above, Janice Hahs was not a BLET member or employee, *see* Ex. 1, at 41, 45, but nevertheless, the evidence showed that over a three-year period, the BLET reimbursed Hahs for expenses related to his wife's travel and attendance at 20 BLET regional conferences and 17 other BLET

---

1. Hahs caused the BLET to pay $1,687.70 for his wife to attend BLET regional conferences and $6,264.27 for his wife to attend non-regional conferences. (Exs. 67–68; Ex. 74).

2. The IBT's October 2000 release, "Local Union Financial and Administrative Policies" stated that, "[i]t is not proper for the Local Union to pay for personal expenses" such as "travel expenses of family members" or "meal expenses of family members." (Ex. L at 6; Ex. 106).

3. The GIA was a separate entity, independent from the BLET, and has its own set of By-laws. (Exs. 50–51; Ex. 55). The GIA mem-

bers were not members of the BLET. (Ex. 24 at 22; Exs. 50–51). Mrs. Hahs was a member of GIA 7 in Atlanta, Georgia (Ex. 34).

4. There was testimony from several BLET officers that the BLET National President was permitted to bring his wife to one regional conference each year at union expense. (Ex. L at 9). Accordingly, in the IRB report recommending the charges against Hahs, Hahs was given credit each year for the most expensive regional conference trip his wife incurred at BLET expense. (Ex. A at 21, fn. 19; Exs. 37–47; Exs. 56–63; Ex. 67).

meetings. *See* Exs. 67–68. As Janice Hahs was not a BLET employee, her expenses could not be coded on a BLET expense report and were listed under Hahs' expenses. *See* Ex. 25, at 73–74. For these reasons, the IBT properly found that Hahs had "expanded" on established BLET travel practices. *See* Ex. L, at 13.

Second, the IBT also reasonably determined that Hahs failed to demonstrate that his wife engaged in any union functions while attending the BLET meetings. The IBT was "unwilling to conclude that paying for his wife's travel to Union meetings and events so that he was not a 'fifth' wheel at ancillary social events or so that she could attend social events 'with other women' served a legitimate union purpose." Ex. L, at 13. Indeed, the record showed that Janice Hahs did not have a leadership role or any significant involvement in any of the BLET meetings to which she traveled. *See, e.g.,* Ex. 1, at 114–15 (no documentation showing Janice Hahs' role at meetings she attended); at 188–89 (no memorialization of any action taken by Janice Hahs at Western General Chairman's Association meeting, purpose of her attendance was to "socialize" and "be around with the other presidents and their wives,"); *id.* at 191–92 (role at General Committee meeting in Memphis was to "help[ ] with socializing with the women there and visit with the designated council"). Nor does the record support Hahs' contention that his wife's duties included attending events and reporting back to BLET members on news or developments from the meetings. *See, e.g.,* Ex. K, at 496 (no indication that Janice Hahs prepared report to BLET members or spouses after attending Democratic National Convention); Ex. 1, at 168–69 (after meeting in Ft. Lauderdale, Hahs reported back on events, not his wife). Further demonstrating the personal, rather than professional, nature of Hahs' wife's attendance at union

meetings, Hahs justified her travel to a St. Louis meeting because it had been an "educational experience" for her, *see id.* at 499–500, hardly a union purpose.

Nor does the record reflect that the travel expenses of Janice Hahs were justified by her involvement in the Grand International Auxiliary ("GIA"), an organization created to support the interests of BLET members and their families, of which many spouses are members. *See* Exs., 53–55. Becky Schneider, GIA's National President, testified at the IBT hearing that although Janice Hahs was involved in the GIA, she had a significant role in only one of twelve GIA conferences that were held from 2004 to 2006. *See* Ex. K, at 255–56.

Nor did Janice Hahs' status as a member of the GIA justify the reimbursement of her travel expenses. Under the GIA's Bylaws, officers generally pay for their own travel expenses. *See* Ex. 55, at 4–9. Furthermore, GIA President Schneider testified that although the GIA paid travel expenses for members to attend meetings on certain occasions, the GIA policy regarding reimbursement did not apply to Janice Hahs because she was not a national officer of the GIA. *See id.* Ex. K, at 248–50. As Janice Hahs' travel expenses should not have been reimbursed under either the BLET's travel policy or the GIA's Bylaws, and Janice Hahs did not play any significant role in the affairs of either entity, the IBT properly found that her expenses were not incurred for union purposes. Indeed, in similar factual contexts, courts have upheld charges of embezzlement. *See United States v. Oliva,* 46 F.3d 320, 322 (3d Cir.1995) (embezzlement charges based on union payment for airline tickets of union employee, his wife and children); *United States v. Nell,* 526 F.2d 1223, 1226–28 (5th Cir.1976) (embez-

zlement charges based on union payment for members' trip to Europe with spouses).

Furthermore, Hahs' contention that the reimbursement for these expenses was justified because his "predecessors and successors also travelled extensively with their wives at union expense," Hahs Objections, at 16, is unavailing. As an initial matter, none of the "traditions and practices" cited by Hahs regarding spousal travel, see Hahs Objections, at 15, are reflected in the BLET's Bylaws or travel policy. See Ex. L, at 13; Ex. 107.

To the extent that the record reflects the informal understanding of BLET Presidents and officers that (1) vice presidents could take their spouses on one regional meeting per year at the BLET's expense, and (2) the BLET President could bring his spouse to events as "appropriate," see Ex. K, at 84–85, 121–22, 150–51, 195–96, as noted above, Hahs plainly exceeded an "appropriate" expenditures. Hahs testified that he did not need approval from the BLET to charge his wife's travel expenses to the union, see Ex. 1, at 41–43, and that he believed that his wife's meals, as well as meals where his "wife is entertaining other members' wives" could be charged to the union, see id. at 133–34, 196–97, 211–12. When the appropriateness of his wife's expenses was raised by another Executive Committee member, William Walpert, as well as the BLET employee who handled the union's expense reports, Patty Smith, in 2004 and 2005, Hahs responded by continuing to expense his wife's travel through 2006. See Ex. 1, at 44, Ex. 5, at 72–74, Ex. 21, at 76–77. Hahs further demonstrated his willing and intentional use union funds for personal use when he charged his grandson's registration fees, Ex. L, at 13, Ex. 66, and multiple in-room movies per day, even though he thought the rule was "one movie per day," see Ex. A, at 27–28, Ex. 1, at 473–74. Although Hahs acknowl-

edged that there was no union purpose for his grandson, who was neither a BLET member nor a BLET employee, to attend these conferences (Ex. 1 at 117–120) and later reimbursed the BLET for these expenses, see Ex. L., at 15, that he charged these amounts to the union undermines his assertion here that he sought reimbursement for appropriate expenses based on previous BLET practices. The IBT thus properly found that Hahs had breached his fiduciary duty to the BLET by charging his wife's travel expenses.

For these reasons, it was not arbitrary or capricious for the IRB to uphold the IBT's finding that Hahs breached his fiduciary duty in causing the BLET to expend union funds for non-union purposes.

B. *Hahs Fails to Establish Any Procedural Defect in His IBT Hearing Based Purported "BLET Autonomy" After the 2004 Merger of the BLET and IBT*

Hahs' objections to Application 131 also fail to identify any procedural defect in his IBT hearing process, and his argument that the BLET's Bylaws "prohibit the IBT and IRB from imposing any discipline" against him, see Hahs Objections, at 9, is wholly without merit.

1. Hahs is Bound by the Consent Order Procedures

██ In his submission, Hahs claimed that, "[t]he IBT and IRB lacked jurisdiction to impose sanctions against Hahs because of the autonomous power reserved to the BLET under the merger. Only the BLET Advisory Board held authority to discipline the elected National President of the BLET's 55,000 members." (Br. at 21). In his submission, Hahs also alleged that,

> [b]ased upon the Merger Agreement, the IBT and IRB should have assured fairness and internal union due process and rejected efforts to hold Hahs and

the BLET retroactively responsible for full compliance with the Consent Decree and its 19 year history of the application to the Teamsters.

(Br. at 8). The conduct at issue here unquestionably falls within the Consent Order.

All IBT members, such as Hahs, are bound by the Consent Order procedures. *United States v. IBT [Friedman and Hughes]*, 905 F.2d 610, 622–623 (2d Cir. 1990); *United States v. IBT [Adelstein]*, 998 F.2d 120, 124 (2d Cir.1993). Paragraph G of the Consent Order grants the IRB authority to investigate corruption within the IBT and to recommend disciplinary charges to the appropriate IBT entity. The Merger Agreement between the IBT and the BLET could not and did not alter the Consent Order. (Hahs Ex. B–1). When Hahs became an IBT member, he came within the scope of the Consent Order.

As the IBT found, Hahs acknowledged being aware of the Consent Order. (Ex. K at 466; Ex. L at 7). Moreover, the Consent Order provisions regarding the IRB were specifically incorporated into the IBT Constitution, with which Hahs, as the National President of the BLET, should have been familiar. (Ex. K at 467–68). Significantly, the IRB-recommended charge against Hahs concerned conduct after January 1, 2004 when the BLET merged with the IBT and Hahs became an IBT member. (Ex. A). The applicable Consent Order procedures were followed, and Hahs received a full and fair hearing: he received notice of the charge and the evidence against him before the hearing, he was represented by counsel, testified on his own behalf and presented witnesses. (Ex. K).

Hahs claimed that under the BLET By-laws, the BLET National Advisory Board should have been the entity to hear the charge against him. (Br. at 9). This ignored that the IRB, under the Consent Order provisions which were incorporated into Article XIX, Section 14 of the IBT Constitution, also has the power to recommend a charge against IBT members, including BLET officials such as Hahs. *Cf., United States v. IBT [Friedman and Hughes]*, 905 F.2d at 617–619 (both IBT and court officers have disciplinary jurisdiction over members).[5] Moreover, the Merger Agreement between the BLET and the IBT provided that Article XIX of the IBT Constitution, which, as noted above, contained the Consent Order provisions regarding the IRB, applied to disciplinary charges filed after the effective date of the merger, which was January 1, 2004. (Hahs Ex. B–1 at 8).

▮ Hahs' claim that, as a result of the merger with the IBT, he has been unfairly held to a new standard of conduct is baseless. (Br. at 8). As the IBT found,

Neither Hahs nor any of the witnesses [who] testified on his behalf explained why they believed merging with the IBT and becoming subject to the Consent Decree somehow altered the fiduciary standards to which BLET officers are required to conform when dealing with the Union's money and other assets. Nor did Hahs or his witnesses explain how enforcing these fiduciary standards

---

**5.** Under the disciplinary provisions of the IBT Constitution, IBT entities have the authority to hear charges initiated from within the IBT. Under the Consent Order and the IBT Constitution, the IRB also has the authority to recommend disciplinary charges to an appropriate IBT entity. Pursuant to Article XIX, Section 14(c)(1) of the IBT Constitution, the IRB has the authority to determine the appropriate IBT entity to hear IRB-recommended charges.

against Hahs would impair the BLET's autonomy.

(Ex. L at 7). Union money must be used for a union purpose. *Morrissey v. Curran,* 650 F.2d 1267, 1273–75 (2d Cir.1981); 29 U.S.C. § 501(a). As the IBT properly found, "[t]he fiduciary standards that Union officers must satisfy when dealing with Union funds and other assets are imposed by federal law that applies to all labor organizations. The Consent Decree did not change these standards beyond providing additional procedures to enforce them." (Ex. L at 10).

Hahs also claimed that the disciplinary action against him, "[f]ailed to properly apply the BLET standards and practices." (Br. at 2). This is inaccurate. The IBT hearing panel, which included a BLET member, heard testimony from Hahs and others about the BLET's practices. (Ex. K). As discussed above, the evidence supported the IBT's finding that Hahs' actions were not consistent with the BLET's past practices.

Hahs raises no basis for his contention that he is not subject to the terms of the Consent Order. Hahs identifies no provision of the IBT/BLET Merger Agreement supporting the contention that he, as a BLET member, is exempted from the Consent Order procedures. To the contrary, the Merger Agreement, a copy of which is appended to the IBT's November 3, 2008 response to Application 131, provides that the "provisions of the IBT Constitution shall apply on and after January 1, 2004." *See* Merger Agreement, Section 6.6. The Consent Order is referenced on the very first page of the IBT Constitution. *See* Government's Response, Ex. A, at 1.[6] Moreover, there is no dispute in the record that the disciplinary charges heard by the IBT hearing panel concerned conduct after the January 1, 2004 merger of the IBT and BLET. *See* Application 131, Ex. A (IRB-recommended charge). Indeed, Hahs acknowledged during his testimony before the IBT hearing panel that he was aware of the Consent Order. *See* Ex. K, at 466; Ex. L, at 7.

Hans' argument that the IRB lacked authority to refer charges to IBT is also unavailing. The Consent Order expressly grants the IRB authority to investigate corruption within the IBT and to recommend disciplinary charges to the IBT for further proceedings. For these reasons, the terms of the Consent Order apply to Hahs, and he can demonstrate no procedural defect on this ground.

2. Hahs Has Not Demonstrated Any Procedural Defect in His Disciplinary Proceedings That Violates the LMRDA

Hahs has not demonstrated any procedural violation of the Labor Management Reporting and Disclosure Act ("LMRDA") based on the IBT's issuance of a disciplinary action to a BLET officer.

Section 101(a)(5)(C) of the LMRDA "does not require that union disciplinary hearings incorporate the specific protections associated with judicial proceedings, including the right to be represented by counsel and the technical rules of pleading, procedure, and evidence." *Frye v. United Steelworkers of Am.,* 767 F.2d 1216, 1224 (7th Cir.), *cert. denied,* 474 U.S. 1007, 106 S.Ct. 530, 88 L.Ed.2d 461 (1985), *cited in United States v. IBT ("Kikes"),* 88 Civ. 4486(LAP), 2007 WL 2319129, at *4 (S.D.N.Y. Aug. 9, 2007). A violation of a procedural provision of a union constitution is only actionable if the party was deprived of a full and fair hearing as a result. *See Carey and Hamilton,* 247 F.3d at 385–86. "A court considering

---

6. Excerpts of the IBT Constitution are appended hereto as Exhibit A.

a claim for relief under the LMRDA because a party alleges that an internal union disciplinary hearing violated the union's constitution must conduct a two-step inquiry: (1) the court must find that the hearing violated the constitution; and (2) it must find that the violation deprived plaintiffs of a fair trial within the meaning of the LMRDA." *Yager v. Carey,* 159 F.3d 638 (D.C.Cir.1998), *aff'g* 910 F.Supp. 704, 713 (D.D.C.1995); *see Gillen,* 2008 WL at 2743695, at *5 (citing *Yager,* 159 F.3d at 638). Accordingly, "courts should intervene in union disciplinary actions under section 101(a)(5) only if there has been a breach of fundamental fairness." *See Kikes,* 2007 WL 2319129, at *4; *United States v. IBT ("Carey and Hamilton Discipline"),* 22 F.Supp.2d 135, 143 (S.D.N.Y. 1998).

 Hahs has not established that the IBT's issuance of discipline in this matter violated the LMRDA. Hahs has not identified any violation of the IBT Constitution or the BLET Bylaws that would satisfy the first prong of an LMDRA violation. Indeed, to the extent that he argues that he, as a BLET officer, could not be disciplined by the IBT, he has failed to identify any provision of the BLET Bylaws that support this contention. Hahs cites to Section 14(a) of the BLET Bylaws, which states that the BLET's Advisory Board has the authority "to suspend a national officer who fails or refuses to perform the duties for which he was elected or is at anytime guilty of any action calculated to injure the organization in any way." *See* Hahs Objections, at 9; Ex. 2, at 28 (BLET Bylaws, revised June 2 006). However, as Hahs concedes in his brief, Section 14(a) also expressly references a hearing procedure conducted pursuant to the IBT Constitution. Section 14(a) provides that a BLET office may be suspended without pay "after having been afforded a full and fair hearing in accordance with Article XIX, Section 3 of the IBT Constitution ..." *See* Hahs Objections, at 9 (emphasis added); Ex. 2, at 28. Hahs has not identified any provision of the BLET Bylaws prohibiting the IBT from issuing sanctions following a disciplinary decision and has not argued that the IBT violated any provision of Article XIX of the IBT Constitution in issuing the disciplinary decision. Accordingly, Hahs has failed to establish any violation of the IBT Constitution or BLET Bylaws.

Hahs also has not established a violation of Section 4(d) of the IBT Constitution, which provides that charges against elective officers of the IBT or any subordinate body—

[S]hall be limited only to those activities or actions occurring before their term of office, and only those activities and actions occurring prior to their current term which were not then known generally to the membership of the International Union or the subordinate body in the case of an officer of a subordinate body.

*See* IBT Constitution, Article XIX, Section 4(d) (Government's Response, Ex. A). Hahs suggests in his objections that because the issue of his expenses was known and raised by a rival candidate during 2006 BLET convention, he cannot be disciplined for the conduct now. *See* Hahs Objections, at 6–7. However, as the IBT noted in its decision in this case, although the BLET's purchase of the Cleveland Cavalier tickets and payment for Janice Hahs' travel expenses were raised during the 2006 BLET convention in 2006, *see* Ex. L, at 7, Ex. 1, at 45–47, Ex. K, at 376–77; Ex. 24, at 33–42, there is no indication in the record that "those issues that were raised during the campaign were more broadly known to the BLET membership at large[.]" Ex. L, at 7. Perhaps more im-

portantly, Section 4(d) does not bar disciplinary charges against Hahs because he has never admitted to the conduct for which he was charged, *see* Ex. L, at 7–8, and indeed, denied any wrongdoing during his IBT hearing, *see* Ex. K, at 470 ("There is not a question that I did not embezzle money."). The Court of Appeals has previously upheld disciplinary actions issued where allegations of wrongdoing were known by the membership but "vigorously denied" by the charged member. *See Friedman and Hughes,* 905 F.2d at 620. Accordingly, Hahs has not demonstrated any violation of the IBT Constitution in the course of his disciplinary proceedings.

Even if Hahs could establish a violation of the IBT Constitution or BLET Bylaws, he cannot establish the second prong of an LMRDA violation, which requires a member to establish that a "breach of fundamental fairness" occurred during his disciplinary proceedings. As noted above, Hahs was provided with advance notice of the hearing date, written notice of the charges against him, and documentary evidence supporting the charge. *See* Exs. A, G; *see also Carey & Hamilton Discipline,* 22 F.Supp.2d at 143. At the panel hearing, Hahs was represented by counsel and presented witnesses and evidence in his defense. *See* Ex. K; *Carey & Hamilton Discipline,* 22 F.Supp.2d at 143. He therefore cannot demonstrate that his disciplinary proceedings violated the LMRDA.

### C. *The Sanction Imposed Upon Hahs Was Not Arbitrary or Capricious*

■ Finally, the sanction imposed upon Hahs as a result of the IRB charge was not arbitrary and capricious. Hahs does not appear to challenge his removal

from BLET office and employment until 2010 and his one-year suspension from membership; rather he focuses his objections on the $44,963.67 fine issued by the IBT. *See* Hahs Objections, at 2. The fine represented the net expenditure by the BLET for the Cleveland Cavalier tickets and the travel expenses of Janice Hahs. *See* Ex. L, at 14–15. Although the IRB's proposed charge estimated that Hahs had caused the BLET to spend $58,000 for non-union purposes, *see* Ex. A, at 41–42,[7] the IBT issued a fine in the amount of $44,963.67, which reflected a reduction for amounts already repaid by Hahs to the BLET, *see* Ex. L, at 14–15. For the following reasons, the IRB was within its discretion to affirm the IBT's issuance of a fine to Hahs.

It is well settled that a "district court reviews penalties imposed by the IBT in accordance with the Consent Decree under an 'arbitrary and capricious' standard." *Boggia,* 167 F.3d at 120; *Gillen,* 2008 WL 2743695, at *10. In reviewing IRB sanctions, this Court asks only whether the sanction imposed represents an "allowable judgment" in the choice of the remedy. *United States v. IBT ("Wilson, Dickens, Weber"),* 978 F.2d 68, 73 (2d Cir.1992) (citation omitted). "[T]he reviewing court should not overturn the . . . choice of sanctions unless it finds the penalty unwarranted in law or without justification in fact." *Simpson,* 120 F.3d at 348 (citing *Wilson, Dickens, Weber,* 978 F.2d at 73); *see also United States v. IBT ("Bane"),* No. 88 Civ. 4486(LAP), 2002 WL 654128, at *16 (S.D.N.Y.2002) ("The relevant inquiry with respect to an IRB sanction is not whether the Court agrees or disagrees with it but rather is limited to whether the IRB made an allowable judgment in its choice of rem-

---

**7.** Exhibits 8–9, 66, 67, and 68 reflect an itemized accounting of the amounts spent by the BLET on the Cleveland Cavalier tickets, the

travel expenses of Janice Hahs, and other personal expenses of Hahs.

edy.") (citation omitted), *aff'd*, 59 Fed. Appx. 424 (2d Cir.2003).

The fine imposed on Hahs is an allowable judgment because the IBT Constitution specifically provides for the imposition of fines. *See* IBT Constitution, Article XIX, Section 10(a) (Government's Response, Ex. A). Section 10(a) provides that decisions and penalties imposed on IBT members and officers "may consist of reprimands, fines, suspensions, expulsions, revocations, denial to hold any officer permanently or for a fixed period, or commands to do or perform, or refrain from doing or performing, specified acts." *See id.* Moreover, the Court of Appeals has acknowledged the appropriateness of fines in the union disciplinary context. *See United States v. IBT (Giacumbo)*, 170 F.3d 136, 144–45 (2d Cir.1999) (IRB proposed sanction of suspension and fine not "arbitrary or capricious," and remanding for IRB to consider sanctions in light of subsequent misconduct); *United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 68 (2d Cir.1995) (affirming fines issued in disciplinary proceedings pursuant to consent judgment).

The $44,963.97 fine imposed by the IBT was not arbitrary or capricious in that it represented the total amount of the Cleveland Cavalier tickets and Hahs' wife's travel expenses where the evidence showed no segregable aspect of the expenditure that was union-related. For instance, Hahs argues that the IBT erroneously fined him for the entire price of the tickets because others used the tickets, *see* Hahs Objections, at 12–13, but he conceded during his April 12, 2007 deposition that he kept no records relating to the use of the tickets and therefore could not identify any particular tickets that were used by current or prospective tenants in the building. *See* Ex. 1, at 72–74, 83. Accordingly, the IBT's issuance of a fine for the entire amount of the tickets, subtracting amounts Hahs had already refunded, was not arbitrary or capricious. *See* Ex. L, at 14–15.

Hahs' argument the IBT's imposition of a fine for his wife's travel expenses ignored the "BLET's long traditions and practices" regarding the "leadership provided, directly and indirectly, by the wives of the principal officers of the International Union" is also unavailing. *See* Hahs Objections, at 15–16. The IBT properly found that although it "cannot say that an expenditure of union funds for travel by a union official's spouse will invariably be considered in improper," the record in this case did not support Hahs' contention that a union purpose was served by his wife's travel. *See* Ex. L, at 12–13. As set forth *supra*, the record evidence showed that Janice Hahs was not an employee of the BLET, *see* Ex. 1, at 41–42; Ex. L, at 9, or an officer of the BLET's Grand International Auxiliary, *see* Ex. L, at 5, 9, 13. Moreover, Hahs conceded in his deposition testimony and in his IBT hearing that his wife did not have any documented leadership role or other significant participation in the union's affairs at the events she attended. *See, e.g.,* Ex. 1, at 47–48 (no documentation of Janice Hahs' role in union meetings), at 99, 114, 188–89, 258–59 (no reference to Janice Hahs as "liaison" or her actions in support of union); at 258–59 (no role in National Wage Rule Meeting). The IBT rejected Hahs' contention that his wife's travel expenses were justified because her attendance at social events with him and the spouses of other members was "expected." Ex. L, at 12–13. Because Hahs was unable to substantiate Janice Hahs' role or contribution to the BLET at the events and functions to which she traveled, the IBT's imposition of a fine for these amounts was not arbitrary or capricious.

Conclusion

For the reasons set out above, Application 131 is granted, and the IRB's determination affirmed in all respects.

SO ORDERED.